# COMMONWEALTH vs. LEONARD SZERLONG.

Bristol. May 3, 2010. - September 14, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Constitutional Law,* Confrontation of witnesses. *Practice, Criminal,* Confrontation of witnesses, Argument by prosecutor. *Evidence,* Unavailable witness, Hearsay. *Witness,* Unavailability. *Intent. Due Process of Law. Words,* "Forfeiture by wrongdoing."

Discussion of the doctrine of forfeiture by wrongdoing, which provides that a criminal defendant may forfeit his right of confrontation if a witness is absent by the defendant's own wrongful procurement; the doctrine's scope under Massachusetts and Federal law; and the continuing vitality of this court's holding that forfeiture by wrongdoing may be established where the defendant, with the intent to make the witness unavailable, actively assists the witness in becoming so. [860-863]

At a hearing on a motion in limine brought by the Commonwealth in a criminal case, in which the Commonwealth sought the admission in evidence of hearsay statements made by the victim before she married the defendant, a preponderance of the evidence supported the judge's implicit finding that the defendant married the victim with the intent to enable her to claim her spousal privilege and thereby avoid testifying against the defendant [863-866]; further, the resulting admission of the evidence under the doctrine of forfeiture by wrongdoing did not violate the defendant's right to due process, where the hearsay evidence bore substantial indicia of reliability [866-868].

At a criminal trial, a statement by the prosecutor in closing argument that improperly invited the jury to draw an adverse inference from the victim's presence in the court room and her failure to testify did not create a substantial risk of a miscarriage of justice, where the error was invited by defense counsel's closing argument. [868-871]

COMPLAINT received and sworn to in the Attleboro Division of the District Court Department on December 21, 2007.

The case was tried before *Gregory L. Phillips,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Neil L. Fishman* for the defendant.

*Rachel J. Eisenhaure,* Assistant District Attorney (*Jessica Hanley* with her) for the Commonwealth.

GANTS, J. At approximately 2 A.M. on December 13, 2007, the defendant entered his girl friend's home, grabbed her by the throat while she was asleep, and held a knife to her throat.[1] On December 21, 2007, the defendant was charged in a criminal complaint with assault and battery, in violation of G. L. c. 265A, § 13A (a); assault by means of a dangerous weapon, in violation of G. L. c. 265, § 15B; and home invasion, in violation of G. L. c. 265, § 18C, and a warrant was issued for his arrest.[2] The defendant and the victim had not been engaged to marry at the time of the assault, but they were married on January 5, 2008, at the North Attleborough town hall. On January 15, the defendant voluntarily surrendered himself to the court and was arraigned. At that time, the Commonwealth moved for a dangerousness hearing under G. L. c. 276, § 58A. At the dangerousness hearing on January 23, the victim testified that she was married to the defendant and invoked her spousal privilege. She continued to invoke her spousal privilege and refused to testify at trial.[3]

Before trial, the Commonwealth moved in limine to admit hearsay statements made by the victim before she married the defendant to a close friend, to her sister, and to a police detective. The Commonwealth claimed that, by marrying the victim so that she could claim her spousal privilege, the defendant had

[1] There is confusion in the record as to whether the incident occurred on December 12 or 13, but we conclude from the evidence that it more likely occurred in the early morning of December 13.

[2] The home invasion count was subsequently nolle prossed, and the judge allowed the Commonwealth's motion to join a new charge of breaking and entering into a building at nighttime with intent to commit a felony, G. L. c. 266, § 16.

[3] Under the spousal privilege, a spouse may not be compelled to testify in any criminal proceeding brought against the other spouse. G. L. c. 233, § 20, Second. See Mass. G. Evid. § 504(a), at 104 (2010). The privilege applies even if the spouse and the defendant were not married at the time of the alleged acts that form the basis of the criminal charge against the defendant spouse. See Commonwealth v. DiPietro, 373 Mass. 369, 382-388 (1977). The privilege may be claimed only by the witness spouse, not by the defendant spouse. See Commonwealth v. Stokes, 374 Mass. 583, 595 (1978). The spousal privilege is different from the rule of spousal disqualification, which prohibits each spouse from testifying as to private conversations with the other, but does not apply to a criminal proceeding, as here, where one spouse is charged with a crime against the other. G. L. c. 233, § 20, First. See Mass. G. Evid., supra at § 504(b), at 104.

forfeited his right to object on confrontation and hearsay grounds to the admission of her out-of-court statements under the forfeiture by wrongdoing doctrine. After an evidentiary hearing, the judge allowed the Commonwealth's motion in limine without making findings of fact or law. On May 6, 2008, a jury in the District Court convicted the defendant of one count of assault and battery.[4]

We must decide whether the scope of our forfeiture by wrongdoing doctrine, as announced in *Commonwealth* v. *Edwards*, 444 Mass. 526 (2005) (*Edwards*), is consistent with the United States Supreme Court's more recent articulation of the forfeiture doctrine in *Giles* v. *California*, 554 U.S. 353 (2008) (*Giles*). We conclude that it is. We also conclude that the hearsay evidence was properly admitted where the defendant forfeited his confrontation and hearsay objections to the admission of the victim's statements because he intended, by marrying the victim, to enable her to exercise her spousal privilege and thereby make her unavailable to testify at trial. We further conclude that the defendant's right to due process was not violated because the hearsay evidence bore substantial indicia of reliability, and that the prosecutor's improper closing argument did not create a substantial risk of a miscarriage of justice.

*Discussion.* 1. *Forfeiture by wrongdoing.* In 1878 the Supreme Court established the doctrine of forfeiture by wrongdoing in *Reynolds* v. *United States*, 98 U.S. 145, 158 (1878) (*Reynolds*): "The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away." See *Crawford* v. *Washington*, 541 U.S. 36, 62 (2004) (doctrine of forfeiture by wrongdoing "extinguishes" criminal defendant's right to confrontation under the Sixth Amendment to the United States Constitution). The Court explained that the doctrine of forfeiture by wrongdoing

---

[4]At the close of all the evidence at trial, the judge allowed the defendant's motion for a required finding of not guilty on the breaking and entering charge. The jury found the defendant not guilty of assault by means of a dangerous weapon. On the assault and battery conviction, the defendant was sentenced to two and one-half years in a house of correction.

"has its foundation in the maxim that no one shall be permitted to take advantage of his own wrong." *Reynolds, supra* at 159.

In 2005, we concluded that, under the doctrine of forfeiture by wrongdoing, a defendant may also forfeit his right to object to the admission of hearsay evidence under art. 12 of the Massachusetts Declaration of Rights and our common-law rules of evidence.[5] *Edwards, supra* at 536. We held that three factual findings are required for forfeiture by wrongdoing to apply: "(1) the witness is unavailable; (2) the defendant was involved in, or responsible for, procuring the unavailability of the witness; and (3) the defendant acted with the intent to procure the witness's unavailability." *Edwards, supra* at 540. "A defendant's involvement in procuring a witness's unavailability need not consist of a criminal act"; the "wrongdoing" in forfeiture by wrongdoing is simply the intentional act of making the witness unavailable to testify or helping the witness become unavailable. *Id.* at 540-542. Forfeiture by wrongdoing "may include a defendant's collusion with a witness to ensure that the witness will not be heard at trial." *Id.* at 540. The Commonwealth need not show that the defendant threatened, coerced, persuaded, or pressured a witness to avoid testifying, or physically prevented the witness from testifying. *Id.* at 541. Where a defendant actively assists a witness's efforts to avoid testifying, with the intent to keep the witness from testifying, forfeiture by wrongdoing may be established "regardless of whether the witness already decided 'on [her] own' not to testify." *Id.*

Three years after our decision in *Edwards,* the Supreme Court in *Giles* held that, under the Sixth Amendment, the forfeiture by wrongdoing doctrine applies only where the defendant acts with the intent to prevent the witness from testifying.[6] *Giles, supra* at 360 (right to confrontation not forfeited without showing that

---

[5]We noted that, "[i]n cases involving the hearsay rule and its exceptions, . . . art. 12 [of the Massachusetts Declaration of Rights] provides no greater protection than the Sixth Amendment [to the United States Constitution]." *Commonwealth v. Edwards,* 444 Mass. 526, 536 (2005) (*Edwards*), quoting *Commonwealth v. Whelton,* 428 Mass. 24, 28 (1998).

[6]Elsewhere in *Giles v. California,* 554 U.S. 353 (2008) (*Giles*), the Supreme Court declared that forfeiture by wrongdoing applies "only when the defendant engaged in conduct *designed* to prevent the witness from testifying" (emphasis in original), *id.* at 359, or where the defendant had "the *purpose* of preventing testimony" (emphasis added), *id.* at 368. In the context of

defendant "intended to prevent a witness from testifying"). It is not enough for the defendant to know that his wrongdoing will cause the witness's unavailability to testify at trial; he must intend that result.[7] *Id.* at 360, 368-369, 377. The Court observed that it previously had approved Fed. R. Evid. 804(b)(6), which "codifies the forfeiture doctrine," *Giles, supra* at 367, quoting *Davis* v. *Washington,* 547 U.S. 813, 833 (2006), and includes an intent requirement. Rule 804(b)(6) provides that a hearsay statement is admissible in evidence where the declarant is unavailable and the statement is offered against a party that has "engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." Fed. R. Evid. 804(b)(6) (2010). See generally 5 C.B. Mueller & L.C. Kirkpatrick, Federal Evidence § 8:134, at 232 (3d ed. 2007).

The defendant argues that the intent requirement of *Giles* requires us to narrow our holding in *Edwards* that forfeiture by wrongdoing may be established by collusion between the defendant and the unavailable witness. We conclude that our decision in *Edwards* is consistent with the Supreme Court's decision in *Giles.* We declared in *Edwards* that a defendant's collusion is sufficient to establish forfeiture only where "the defendant acted with the intent to procure the witness's unavailability." *Edwards, supra* at 540. See *id.* at 541-542 ("defendant's *intentional* procurement of a witness's unavailability through collusion . . . sufficient to trigger the doctrine" [emphasis added]). And, to establish collusion, we require that a defendant "actively facilitate[] the carrying out of the witness's independent intent not to testify." *Id.* at 541. By requiring that the defendant actively

forfeiture by wrongdoing, we conclude that the state of mind requirement is the same regardless of whether it is described as intent, design, or purpose.

[7] In *Giles,* the Supreme Court vacated the defendant's murder conviction because the California Supreme Court affirmed the admission in evidence under the forfeiture by wrongdoing doctrine of hearsay statements made by the defendant's former girl friend to the police three weeks before the shooting that caused her death without finding whether the defendant, in killing his former girl friend, intended to make her unavailable as a witness regarding the earlier report of domestic violence. *Id.* at 357, 377. In remanding the case for the court "to consider evidence of the defendant's intent," the Supreme Court noted that the doctrine of forfeiture by wrongdoing is not applicable to "the typical murder case involving accusatorial statements by the victim," because in every murder case the defendant made the victim unavailable to testify. *Id.* at 361, 377.

assist the witness in becoming unavailable with the intent to make her unavailable, our doctrine of forfeiture by wrongdoing is at least as demanding as Fed. R. Evid. 804(b)(6), which permits a finding of forfeiture where the defendant "acquiesced" in conduct that was intended to, and did, make the witness unavailable to testify.[8]

Nor does *Giles* require us to revisit our conclusion in *Edwards* that the wrongdoing that may justify forfeiture need not be criminal. See *Edwards, supra* at 540, 542. The Supreme Court in *Giles, supra* at 368, declared that the wrongdoing that may warrant forfeiture of a defendant's confrontation rights was "conduct designed to prevent a witness from testifying." Indeed, in *Reynolds, supra* at 159-160, forfeiture by wrongdoing was found where the witness, who was the defendant's second wife, lived with the defendant but had left home for three weeks to avoid being served with a subpoena, and where the defendant told the process server that she was not at home but would not say where she was. There was no allegation that the defendant had made the witness unavailable through a criminal act. *Id.* See *Steele* v. *Taylor*, 684 F.2d 1193, 1203 (6th Cir. 1982), cert. denied, 460 U.S. 1053 (1983); *United States* v. *Mayes*, 512 F.2d 637, 650-651 (6th Cir.), cert. denied, 422 U.S. 1008 (1975).

Having concluded that *Giles* does not affect the three factual findings required in *Edwards* for the doctrine of forfeiture by wrongdoing to apply, we turn to the evidence at the motion in limine hearing to determine whether it supports the judge's finding of forfeiture. Tracy Jordan had been a close friend of the victim for twenty years and took care of the victim's baby daughter. She testified that, at the time of the assault, the victim and the defendant did not have plans to marry. Later, the victim telephoned Jordan and said she had something to tell her but was afraid that Jordan would become angry and "lose respect" for her. The victim eventually admitted to Jordan that she had married the defendant. When Jordan became upset and questioned

---

[8]"Acquiescence consists of 'the act or condition of acquiescing or giving tacit assent; agreement or consent by silence or without objection.' " *United States* v. *Rivera*, 412 F.3d 562, 567 (4th Cir.), cert. denied, 546 U.S. 1023 (2005), quoting Webster's Unabridged Dictionary 18 (2d ed. 2001). "[A] defendant need only tacitly assent to wrongdoing in order to trigger [Fed. R. Evid. 804(b)(6)]'s applicability. Active participation or engagement . . . is not required." *United States* v. *Rivera, supra.*

the victim's judgment in marrying the defendant, the victim explained that marriage was the only way that she would not have to testify against the defendant in this case. The victim said that she had discussed the matter with the defendant and they had decided to marry because they knew that, if they were married, she would not have to testify against him.

The only other witness to testify at the motion hearing was the victim's sister, Ann Marie Johnson, who had reported the alleged assault to the police against the victim's wishes. Johnson stated that, when she reported the incident to the police approximately one week after it occurred, she knew of no plans for the victim and the defendant to marry. Although the wedding occurred on January 5, 2008, Johnson did not learn the victim was married until March 10, 2008, three days before Johnson was to respond to a summons to appear in court. The victim said she told Johnson of the marriage so that she would not be "blindsided" by the information in court. The victim told Johnson that she married the defendant because it was the only way she could avoid having to testify in court against the defendant, and she did not want to be the one to put the defendant in jail. Neither Johnson nor any other family member was present at the wedding; Johnson believed that, at the time of the evidentiary hearing, four months after the wedding, their parents still did not know of the marriage.

Though he made no findings of fact, the judge implicitly found that the defendant married the victim with the intent to enable her to claim her spousal privilege and thereby avoid testifying against the defendant.[9,10] We conclude that this implicit

[9]In the future, such findings should be made explicitly by the judge, either orally on the record or in a written ruling.

[10]At the motion hearing, the judge properly declined the defendant's invitation to compel the victim to waive her spousal privilege and testify for purposes of the motion only. A spouse may be compelled to testify outside the presence of the jury only to determine whether she intends to invoke the spousal privilege. See *Commonwealth* v. *Fisher*, 433 Mass. 340, 350 (2001) (with advance warning that witness might refuse to testify, voir dire may be held to "ascertain whether the witness will assert some privilege or otherwise refuse to answer questions"). The spouse cannot be forced to testify regarding her reasons for doing so. See *United States* v. *Montague*, 421 F.3d 1099, 1103 (10th Cir. 2005). Nor may she be forced to testify to matters relevant to determining whether the doctrine of forfeiture by wrongdoing should apply, because such testimony could be harmful if it were to result in a finding of

finding is supported by a preponderance of the evidence.[11] The defendant and the victim were not engaged to be married when the incident occurred on December 13, 2007, but they were wed in town hall on January 5, 2008, after Johnson reported the incident to the police but before the arraignment, while the defendant remained a fugitive. The defendant knew that, as a result of the marriage, the victim would be entitled to the spousal privilege, and that the victim intended to exercise the privilege because she did not want her testimony to cause his conviction. Even if the idea to marry originated with the victim, the defendant agreed to marry, and the victim's spousal privilege existed only because of his agreement. In these circumstances, the judge was entitled to infer that the defendant intended to make her unavailable to testify by agreeing to marry her. The judge did not need to find that making her unavailable as a witness was the defendant's sole or primary purpose in marrying her; it is sufficient that it was a purpose in marrying her. See *United States* v. *Montague,* 421 F.3d 1099, 1103-1104 (10th Cir. 2005) (to establish forfeiture by wrongdoing, sufficient for prosecution to prove that "wrongdoing was at least partially intended to procure the declarant, his wife's, unavailability"); *United States* v. *Gray,* 405 F.3d 227, 242 (4th Cir.), cert. denied, 546 U.S. 912 (2005) ("defendant need only intend 'in part' to procure the declarant's unavailability"); *United States* v. *Dhinsa,* 243 F.3d 635, 654 (2d Cir.), cert. denied, 534 U.S. 897 (2001), quoting *United States* v. *Houlihan,* 92 F.3d 1271, 1279 (1st Cir. 1996), cert. denied, 519 U.S. 1118 (1997) (to establish forfeiture by wrongdoing, prosecution "need only show that the defendant

---

forfeiture and the consequent admission of her prior hearsay statements against the spouse defendant. See G. L. c. 233, § 20, Second (spouse shall not be compelled to testify in any "criminal proceeding against the other"). See also *United States* v. *Montague, supra.*

[11]The defendant asks us to revisit our holding in *Edwards, supra* at 542-544, that the standard required to prove forfeiture by wrongdoing is a preponderance of the evidence. We decline to do so. In *Edwards,* we noted that a majority of the circuit courts of the United States Court of Appeals has applied the preponderance standard, as has a majority of the State courts that have ruled on the standard of proof. *Id.* at 542-543 & nn.24, 25. The Supreme Court has yet to decide the standard of proof but has noted that Federal courts using Fed. R. Evid. 804(b)(6) have "generally" applied the preponderance standard and that "State courts tend to follow the same practice." *Davis* v. *Washington,* 547 U.S. 813, 833 (2006).

'was motivated *in part* by a desire to silence the witness' "
[emphasis in original]).

2. *Due process.* Even though the defendant forfeited his right
to object on both confrontation and hearsay grounds to the vic-
tim's out-of-court statements, he is still entitled to due process.
See *Commonwealth* v. *Wilcox,* 446 Mass. 61, 67-70 (2006)
(defendant in probation revocation hearing has no right of con-
frontation but entitled to due process). Where we have found
forfeiture by wrongdoing, and in other instances in which we
have found good cause to dispense with the defendant's right of
confrontation, we have concluded that due process requires that
any hearsay admitted against the defendant be reliable. See *Ed-
wards, supra* at 540 n.21 ("There may be some statements so
lacking in reliability that their admission would raise due process
concerns"); *Commonwealth* v. *Durling,* 407 Mass. 108 (1990)
(probation revocation hearing). While due process does not bar
the Commonwealth from proceeding solely on the basis of
hearsay, see *Commonwealth* v. *Maggio,* 414 Mass. 193, 196
(1993), where "hearsay is offered as the only evidence" against
the defendant, "the indicia of reliability must be substantial."
*Commonwealth* v. *Durling, supra* at 118.

We look now to the evidence at trial to determine whether the
hearsay statements admitted were sufficiently reliable to satisfy
due process. Jordan, a friend of the victim for twenty years, testi-
fied that she cared for the victim's baby while the victim was at
work. On December 13, 2007, when the victim arrived with the
baby, Jordan noticed and commented to the victim that the baby
seemed uncharacteristically sad. The victim began to cry and,
when she regained her composure after several minutes, stated
that the night before, at 2 A.M., the defendant had broken into her
house, entered her bedroom, attempted to strangle her, held a
knife to her throat, and threatened to kill her. She awoke to find
him with his hands around her neck. The victim told Jordan that
the defendant then held a large knife up to her neck and said that
"if he wasn't going to kill her, he was going to kill himself."
After some time, the victim was able to calm down the defend-
ant, who slept in the living room that night with the baby. In ad-
dition to repeating these statements by the victim, Jordan testified
that she observed that the entire side of the victim's neck was
"red" with "strangle marks."

Johnson, the victim's sister, testified that the victim telephoned her on December 16 to tell her that three days earlier, around 3 A.M., the defendant had broken down two doors to enter her home, tried to strangle her, held a knife to her throat, and threatened to kill her. The victim told Johnson that she had been screaming and "somehow" managed to escape the defendant's grip. The victim stated that she ran into the baby's room, the baby having awoken crying, and that the defendant then left. Johnson testified that she urged the victim to seek help, but the victim "said she did not want to be the one to put [the defendant] in jail."

The Commonwealth also offered the testimony of two police officers, Officer Scott Weiner and Detective John Reilly, both of the North Attleborough police department. Officer Weiner testified that he received a telephone call from Johnson on December 19 about the December 13 incident but that he was not able to reach the victim by telephone, despite numerous attempts. Detective Reilly testified that, approximately three hours after he was assigned to investigate Johnson's complaint regarding the defendant's alleged domestic abuse of the victim, he spoke to the victim by telephone.[12] The victim stated that she would not cooperate with the investigation and "that she was not going to be the one responsible for putting [the defendant] in jail." However, when Detective Reilly conveyed to the victim the allegations against the defendant — that he broke into her home by forcing the door open, entered her bedroom, climbed on top of her, held one hand over her throat while holding a knife in the other hand, indicated that he was under the influence of drugs, and threatened to kill her — the victim acknowledged that "[e]verything that [Detective Reilly] said was true," except that the defendant had intended to harm himself, not her. The victim agreed to visit the police station to meet with Detective Reilly, but she did not arrive as scheduled, and the detective never met with her.

We conclude that the hearsay evidence had substantial indicia

---

[12]In trying to contact the victim, Detective Reilly visited her address. The victim was not home at the time, but the detective observed "heavy damage" to the door casing of the interior door of the house. He testified that, though it was clearly broken, the casing had been put back in place and nailed together.

of reliability to satisfy due process, recognizing that the hearsay statements comprised nearly all of the evidence against the defendant, with the exception of Jordan's physical observation of "strangle marks" on the victim's neck and Detective Reilly's observation of the broken casing of the door to the victim's house. Jordan and Johnson recounted similar detailed versions of what the victim told them occurred, and the victim confirmed these details in speaking briefly with Detective Reilly. See *Commonwealth* v. *Durling, supra* at 121 (similarity of reports and factual detail indicative of reliability). The victim had no motive to deceive her old friend, her sister, or Detective Reilly as to what had occurred, because she did not intend to press charges against the defendant. The circumstances of her revelation to Jordan reflect its spontaneity and, consequently, the unlikelihood of fabrication. Cf. Mass. G. Evid. § 803(2), at 257 (2010) (excited utterance exception to hearsay rule). Cross-examination did not reveal any motive that Jordan or Johnson may have had to fabricate the victim's account of the incident. Jordan's observation of red marks on the victim's "whole neck" and Detective Reilly's observation of the broken door frame at the victim's house corroborated the victim's account.

3. *Prosecutor's closing argument.* The defendant argues that it was improper for the prosecutor to make the following statement in her closing argument:

> "You've heard some other testimony in this trial about the defendant and the victim getting — and the alleged victim getting married sometime after the incident. You've heard counsel's argument about whether or not — how the victim is present in this court room.

> "And I'm not going to instruct you on the law or any instructions that you're going to get from the judge; but you, as the jury, can make your own inferences about witnesses and about whether or not they testify."

The defendant contends that the prosecutor improperly invited the jury to draw an adverse inference from the victim's presence in the court room and her failure to testify. We agree that the prosecutor improperly invited such an inference where no

inference was warranted, but conclude that the impropriety did not result in a substantial risk of a miscarriage of justice.

"No comment may be made and no adverse inference may be drawn" in a criminal case based on the invocation of a privilege by a witness. Mass. G. Evid., *supra* at § 525(b)(1), at 161. Because the spousal privilege belongs to the witness spouse, not the defendant spouse, and because the defendant cannot compel the spouse's testimony, no inference is appropriate from the failure of a spouse to testify. See generally Annot., Propriety and Prejudicial Effect of Prosecutor's Argument Commenting on Failure of Defendant's Spouse to Testify, 26 A.L.R.4th 9, 13 (1983) ("If the privilege of testifying either for or against a defendant spouse is said to belong to the witness spouse, then the courts usually consider it improper for the prosecutor to make adverse comments when the defendant could not have compelled the testimony"). The purpose of the spousal privilege is to protect the relationship of marriage from the potential harm of one spouse giving adverse testimony against the other. See *Trammel* v. *United States*, 445 U.S. 40, 44 (1980) ("modern justification for this privilege against adverse spousal testimony is its perceived role in fostering the harmony and sanctity of the marriage relationship"). If the jury were permitted to draw an inference against the defendant from the spouse's exercise of her privilege, then the purpose of the privilege would be defeated because the spouse's silence would be the practical equivalent of adverse testimony. Therefore, it is not proper for an attorney in closing argument in a criminal case to invite the jury to draw an inference from the failure of a spouse to testify.[13]

Here, the defendant testified that he married the victim on

---

[13]In *Commonwealth* v. *Spencer*, 212 Mass. 438, 450-453 (1912), the court held that a criminal defendant was entitled to a jury instruction that no inference is to be drawn against the defendant from the failure of the spouse to testify only where the defendant called the spouse to the stand and she refused to testify. See *Commonwealth* v. *Happnie*, 3 Mass. App. Ct. 193, 196-198 (1975), quoting *Grady* v. *Collins Transp. Co.*, 341 Mass. 502, 504 (1960) (prosecution allowed to comment on defendant's failure to call spouse where spouse "is in the control of the [defendant] and available"). We do not believe that the holdings in these cases continue to reflect our common law. While we permit an inference to be drawn from a defendant's failure to produce a witness in limited scenarios, this inference requires that the witness be available to the defendant to testify. See *Commonwealth* v. *Franklin*, 366 Mass. 284, 292-294 (1974); *Commonwealth* v. *Ries*, 337 Mass. 565, 585-586

January 5, 2008, and identified the victim as present in the court room. Defense counsel, in his closing argument, twice reminded the jury that the victim married the defendant after the incident and, immediately before he concluded his argument by asking the jury to find the defendant not guilty, told them that the victim "was in court yesterday, and she's present today." While defense counsel did not argue that the jury should infer from the marriage or the victim's presence in the court room that the alleged assault had not occurred, his reference to these facts makes no sense except to invite that inference. We understand the prosecutor's remarks to be in reply to that implicit invitation, which mitigates, but does not justify, the error. See *Commonwealth* v. *Kozec*, 399 Mass. 514, 519-520 & n.9 (1987) (prosecutor may object to defense counsel's argument if improper, and may request appropriate curative instructions, but may not "simply 'fight fire with fire' and exceed the normally proper limits of argument because defense counsel made an improper, excessive argument"). Cf. Annot., *supra* at 45 ("courts [have] held that a defendant's right to complain of an asserted error consisting of a prosecutor's comments on the failure of the defendant's spouse to testify was precluded because such error, if it occurred, was invited or provoked by the defendant himself or by the defendant's attorney").

The defendant did not object to these remarks during or immediately after the prosecutor's closing argument. Rather, the defendant waited until after the judge's final instructions to the jury to proffer his objection. "The defendant's objection . . . made after the jury instructions was too late." *Commonwealth* v. *Allison*, 434 Mass. 670, 687 (2001). Because the objection was untimely, we review the impropriety to determine whether it posed a substantial risk of a miscarriage of justice. "Remarks made during closing arguments are considered in the context of

(1958). Cf. *Commonwealth* v. *Bryer*, 398 Mass. 9, 12 (1986) ("We are sensitive to references to a defendant's failure to adduce evidence on his behalf because of the necessity to avoid shifting the burden of proof to the defendant"). Here, the victim claimed her spousal privilege at the dangerousness hearing, and the Commonwealth does not contend that she was available to testify. She should not be required to invoke her privilege in the jury's presence because of the negative inference they may draw from its invocation. See *Commonwealth* v. *Labbe*, 6 Mass. App. Ct. 73, 79 (1978). See also *Commonwealth* v. *Fisher*, 433 Mass. 340, 350-352 (2001).

the whole argument, the evidence admitted at trial, and the judge's instructions to the jury." *Commonwealth* v. *Caillot*, 454 Mass. 245, 258 (2009), cert. denied, 130 S. Ct. 1527 (2010). Viewed with this perspective, we see no substantial risk of a miscarriage of justice here, especially where the error was invited by defense counsel's closing argument. ·

*Judgment affirmed.*