## COMMONWEALTH vs. EUCLIDES ORTIZ.

Suffolk. April 6, 2012. - September 10, 2012.

Present: IRELAND, C.J., SPINA, CORDY, GANTS, & DUFFLY, JJ.

*Homicide. Evidence,* Hearsay, Expert opinion, Qualification of expert witness. *Practice, Criminal,* Capital case, Hearsay, Assistance of counsel, Comment by prosecutor, Argument by prosecutor, Instructions to jury. *Witness,* Expert.

At a murder trial, the judge did not err in admitting in evidence testimony from the victim's daughter that the victim stated that she was going to a restaurant to pick up the defendant, where the statement was properly admitted as the victim's statement of a present intent to act [409-410]; further, there was no merit to the defendant's contentions that the judge erred in admitting the testimony of a police officer as an expert witness or that the admission of the officer's expert testimony required a determination by the judge that the officer was trustworthy or credible [410-412].

At a murder trial, the prosecutor's inappropriate but isolated mischaracterization of the defendant's statements to a witness did not result in a substantial likelihood of a miscarriage of justice, and therefore, defense counsel was not ineffective for failing to object to the characterization. [412-415]

At a murder trial, no substantial likelihood of a miscarriage of justice arose from the prosecutor's comment, in closing argument, on defense counsel's sexually implicit cross-examination of female witnesses or from the prosecutor's isolated reference to defense counsel's office in New Hampshire, and the prosecutor's characterization of part of defense counsel's argument as "lawyer talk" was a proper response to defense counsel's accusations, in his closing argument, regarding the victim's son-in-law [415-418]; further, the prosecutor in his closing did not contradict his own expert witnesses [418-419].

At a murder trial, the judge's isolated slip of the tongue when instructing the jury did not create a substantial likelihood of a miscarriage of justice. [419-420]

INDICTMENT found and returned in the Superior Court Department on June 19, 2003.

The case was tried before *Regina L. Quinlan,* J., and motions for a new trial, filed on February 27, 2006, and November 23, 2010, were considered by her.

*Richard J. Fallon* for the defendant.

*Joseph M. Ditkoff*, Assistant District Attorney (*Edmond J. Zabin*, Assistant District Attorney, with him) for the Commonwealth.

IRELAND, C.J. On February 8, 2006, a jury convicted the defendant of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. Represented by new counsel on appeal, the defendant argues error in (1) the admission of hearsay; (2) the admission of expert testimony; (3) the prosecutor's questioning of a witness; (4) the prosecutor's closing argument; and (5) the judge's instructions to the jury. We affirm the defendant's conviction and discern no basis to exercise our authority pursuant to G. L. c. 278, § 33E.[1]

*Background.* Based on the evidence, the jury could have found the following facts. The victim, who was fifty-two years of age at the time of her death, owned a multifamily home in the Roslindale section of Boston. She met the defendant in 2000. At some point the defendant moved into the victim's second-floor apartment. They lived together for approximately three years.

In 2003, the victim, accompanied by the defendant, moved to the basement apartment of her building. Although she knew that the defendant had a new girl friend, the victim, in March, 2003, married the defendant as a "favor" and "to get him out of her life." They did not have a "true marriage."

The victim's daughter, the daughter's husband, and their children lived across the street from the victim. The victim and her daughter saw each other every day. Usually the victim, who worked from 2:30 P.M. to 11 P.M. as a school custodian, would take a break to have dinner with her daughter's family around 7 or 8 P.M.

On Thursday, April 17, 2003, the victim ate dinner at her daughter's home with her extended family, arriving between 7

---

[1] The defendant's direct appeal was entered in this court on August 12, 2008; on November 23, 2010, the court granted a stay of his appeal to allow the defendant to file a motion for a new trial. On March 29, 2011, the trial judge denied the motion in a memorandum of decision. The defendant's appeals from his conviction and the denial of his motion for a new trial have been consolidated. The defendant makes no separate argument concerning the propriety of the denial of the latter motion for a new trial. Thus, the judge's action on that motion is subject only to plenary review.

and 7:30 P.M. The daughter observed that the victim was quiet and did not "seem herself." Before leaving, the victim related that she was going to a restaurant to pick up the defendant.

The victim did not have to work the next day because the school was closed for Good Friday. That morning, the daughter repeatedly tried telephoning her mother, on both her mother's cellular and home telephones, but her mother did not answer. She noticed that her mother's automobile was parked outside her home, and the daughter's husband observed it parked there the night before.

On Saturday, April 19, the daughter tried telephoning her mother again. Eventually, she asked her husband to use the key they had to the victim's apartment "to make sure she was okay." He went over to the victim's apartment. The door to the apartment was locked, so he used the key to open it. He opened the door, peered in, and saw the victim's body on the floor, observing a sheet and part of the victim's legs. He returned to his wife, who telephoned 911 and various family members.

Fire fighters arrived first at the apartment, at about 11:46 A.M. Inside they discovered the victim, who was wrapped in a sheet on a bed.[2] The victim had no pulse and was not breathing. There was blood on the sheet, around the bed area, and on the floor. The fire fighters moved some items in the apartment to make space for the victim on the floor so they could attempt life-saving measures.

A few minutes later, an emergency medical technician (EMT) arrived. He observed that the victim's blood was dried, her skin was waxen and milky white, her pupils were fixed, and her body felt cold in the warm basement. In addition, she did not have a carotid pulse. From these observations, the EMT concluded that the victim could not be "save[d]" and that she "had been there for a while." He instructed the fire fighters to stop and directed them to leave the apartment carefully. Soon thereafter, officers of the Boston police department arrived and secured the apartment.

The victim died as a result of multiple stab wounds. She had

---

[2]This testimony varied from that of the victim's son-in-law, who stated that he had found the victim on the floor.

four stab wounds to her neck, one of which perforated her jugular vein and trachea. The victim also had abrasions to her chest and defensive wounds to her hands and arms. The victim was conscious when she was stabbed in the throat, and although she would have eventually lost consciousness due to blood loss, she would have been conscious for some period of time ranging from seconds to minutes. The medical examiner could not provide an opinion concerning the precise time of the victim's death.

Within hours after the discovery of the victim's body, Sergeant Detective Daniel Coleman asked a Spanish-speaking officer to leave a voice mail message in Spanish for the defendant[3] on his cellular telephone stating that it was urgent that he contact Sergeant Detective Coleman and providing a cellular telephone number to do so. No other details were left about the reason for the voice mail message, nor was the victim's name mentioned. The defendant did not return the call.

There was evidence that, around the time of the victim's murder, the defendant had a girl friend who was pregnant with his child, and that he slept at her home in Chelsea on the evenings of April 17 and 18. On Friday, April 18, the defendant was in the vicinity of the victim's apartment at about 12:53 P.M. to collect payment for some painting work he had done earlier that week. In the late afternoon, and then the following morning, he telephoned a longtime friend, Maria Rivera, and arranged to meet later that day, Saturday, at Rivera's apartment on Beacon Street in Chelsea.[4]

On Saturday morning, before the victim's body was found, the defendant was spotted near the victim's automobile by a man who was nearby borrowing a ladder. At approximately noon, the defendant met with Rivera at the Beacon Street apartment. There, he told her that he had a problem and needed a place to stay. Rivera told the defendant he could stay there and that they would talk more after she finished some errands.

Rivera, accompanied by her son, returned to the apartment between 4 and 7 P.M. Rivera told the defendant that she had received some telephone calls about him having killed a woman.

[3]The defendant spoke and understood Spanish.

[4]At trial, Rivera testified on behalf of the Commonwealth.

The defendant replied, "[W]hat's done is done and you cannot go back." She pressed the defendant for "the truth," and he said that he had been in an argument with his wife. She had learned that he had impregnated another woman, and he "lost control of the argument." Rivera asked the defendant whether he had killed her, and the defendant repeated, "What's done is done, you cannot walk back." He added that he needed to give the victim "a Christian burial." He told Rivera that, on the previous day, Friday, he had returned to the apartment to "get the corpse out . . . before the police would find it," but could not get in because there were people around the building. The defendant said he had killed the victim on Thursday afternoon.[5]

At the urging of her son, Rivera, on Sunday evening, went to the Chelsea police station. She stayed there until the following morning. After she spoke with Chelsea police Officer Rafael Rijos, Sergeant Detective Coleman was summoned. Rivera gave the officers the key to her apartment and told them that they would find the defendant there.

Sergeant Detective Coleman, together with two other police officers, went to Rivera's apartment. After announcing their presence and knocking, they used Rivera's key to gain entry. They found the defendant hiding in an armoire behind pillows and clothing. The defendant agreed to accompany them to the police station to talk.

At the police station, the defendant was given the Miranda warnings in Spanish. He acknowledged his rights and signed a waiver form. The defendant, through a Spanish-speaking translator who was a police officer, stated that, around noon on Saturday, he had received a voice mail message from a male telling him that his wife was dead. The defendant said he had not been to the victim's apartment after Wednesday, April 16. He provided inconsistent accounts of his whereabouts on Thursday, April 17. When asked by Sergeant Detective Coleman whether he had ever been in the victim's apartment while she was injured or bleeding, he replied, "I didn't do anything," and then, "No,

---

[5]Rivera admitted that she did not initially relay to police what the defendant had told her. She only came forward with that information after being summonsed to testify before a grand jury.

I wasn't."[6] During the interview, the defendant's cellular telephone rang and he spoke with his girl friend, whom police asked to come to the station. When she arrived, police interviewed her separately. After some time, the defendant and his girl friend left the station together. The defendant stayed the night at her apartment.

The next day, Monday, April 21, the defendant telephoned Rivera and asked to meet with her that evening at a nearby cemetery. Rivera went, accompanied by her son and two of his friends. At the cemetery, the defendant told her that the police "had come to look for him," questioned him, and let him go. He asked Rivera for money so that he could go to the Dominican Republic.

In the meantime, the police investigation revealed that there had been no signs of forced entry into the victim's apartment. Also, there was no evidence of a sexual crime. In the victim's apartment, among some bedding that was strewn near the victim, police recovered a knife. Another knife was found under a couch.[7] Two doorknobs, one to the downstairs basement door and the other to the door on the first-floor landing of the basement staircase, were seized because there were reddish-brown stains on the interior part of each doorknob. There were no other doors from which to leave the apartment. In the stain on the interior doorknob to the downstairs basement door, Boston police Officer Dennis E. LeBlanc, a latent fingerprint examiner, observed some "ridge detail" and placed a protective piece of plastic over it. Subsequently, after conducting an analysis, Officer LeBlanc concluded that the fingerprint retrieved from the interior doorknob to the downstairs basement door matched the defendant's left thumb print. On Tuesday, April 22, that informa-

---

[6]This interview, as well as the one that occurred after the police later arrested the defendant, was not recorded. The interviews took place in 2003 before the release of Commonwealth v. DiGiambattista, 442 Mass. 423, 447 (2004), which concerned the significance of the failure to preserve an interrogation conducted at a place of detention by means of an electronic recording. However, we note that because the case was tried after the DiGiambattista case, the judge properly instructed the jury in accordance with the DiGiambattista decision. See id. at 449 (stating no "need to postpone the implementation of our decision").

[7]No forensic evidence from the knives was recovered.

tion was conveyed to Sergeant Detective Coleman, and he decided to have the defendant arrested.

Later that day, the defendant was apprehended in a closet at his girl friend's apartment and was arrested. He was taken to the Chelsea police station, then transported to a Boston police station. After being read the Miranda rights through an interpreter, the defendant agreed to speak with police (through an interpreter). Sergeant Detective Coleman asked the defendant whether he had ever had the victim's blood on his hands, to which the defendant replied that he had not. The defendant stated that he had not been inside the victim's apartment when she was injured or bleeding. Sergeant Detective Coleman seized some personal items from the defendant, including a watch.

Subsequent forensic testing revealed that the reddish-brown stains from both doorknobs recovered from the victim's apartment tested positive for human blood. Deoxyribonucleic acid (DNA) testing revealed that the victim's DNA profile matched the DNA profiles of blood extracted from both the downstairs basement interior doorknob[8] and the defendant's watchband,[9] see note 10, *infra*, and that the defendant was excluded as a possible contributor of the DNA from these profiles. The statistical significance of the DNA testing results was presented to the jury.[10] See *Commonwealth* v. *Lanigan*, 419 Mass. 15, 20 (1994) (evidence of DNA "match" is meaningless without evidence indicating significance of match).

The defendant did not testify or call any witnesses. His trial counsel elicited testimony during the cross-examination of two of the Commonwealth's witnesses who conducted various forensic examinations that there are no tests to determine how long blood has been present on an item. He also tried to suggest

[8]It appears that only one doorknob was subjected to DNA testing.

[9]There were no visible stains on the watchband. Once the watchband was expanded, reddish-brown stains were observed on eight of the interior metal sections of the watchband.

[10]The probability of another randomly selected individual having a DNA profile matching those obtained from the downstairs interior doorknob and the defendant's watchband is approximately one in 1.5 quintillion of the Caucasian population, one in 250 quintillion of the African-American population, and one in 4.4 quintillion of the Southeastern Hispanic population. The victim was from the Dominican Republic.

that the defendant had spent the evening of April 17 with a woman that he had formerly dated. Defense counsel argued that Rivera was not a credible witness (see note 5, *supra*), that the defendant had no motive to kill the victim because they did not have a true marriage, that the police investigation was inadequate, and that the defendant could not have killed the victim because the automobile he drove did not test positive for the victim's blood and no one ever saw him with blood on his person. He suggested that the blood found on the door knob and inside the defendant's watchband could have been deposited long ago.

*Discussion.* 1. *Admission of hearsay.* The defendant challenges the admission of the testimony of the victim's daughter that the victim told her that "[s]he was going to a restaurant, supposedly, to pick up [the defendant]." As an initial matter, we reject the defendant's contention that the statement amounts to multiple hearsay. The defendant asserts that this statement conveyed the fact that the defendant told the victim that he would meet her at the restaurant, amounting to hearsay within hearsay. The trial transcript, however, does not support this argument. The victim's daughter's statement only conveys that the victim expressed an intention to go to a restaurant to pick up the defendant and, significantly, is silent to anything that the defendant may or may not have said. The statement was only that of the victim, not of the defendant.

Although the statement constitutes hearsay, it was properly admitted as the victim's statement of a present intent to act.[11] "Statements, not too remote in time, which indicate an intention to engage in particular conduct, are admissible to prove that the conduct was, in fact, put in effect." *Commonwealth* v. *Avila*, 454 Mass. 744, 767 (2009), quoting *Commonwealth* v. *Ferreira*, 381 Mass. 306, 310 (1980). See Mass. G. Evid. § 803(3)(B)(ii)

---

[11]Pursuant to our review under G. L. c. 278, § 33E, this statement is not testimonial in nature and its admission does not violate the confrontation clause to the Sixth Amendment to the United States Constitution. See *Crawford* v. *Washington*, 541 U.S. 36, 59 (2004). See also *Commonwealth* v. *Gonsalves*, 445 Mass. 1, 12-13 (2005), cert. denied, 548 U.S. 926 (2006) (explaining that in determining whether hearsay is testimonial in fact "proper inquiry is whether a reasonable person in the declarant's position would anticipate the statement's being used against the accused in investigating and prosecuting a crime").

(2012). The victim's statement that she was going to a restaurant to pick up the defendant falls within this exception. Because admission of this statement was not error, there could be no ineffective assistance of the defendant's trial counsel based on counsel's failure to object to the admission of (or failure to move to strike) the statement.[12] See *Commonwealth* v. *Thompson,* 431 Mass. 108, 120, cert. denied, 531 U.S. 864 (2000), and cases cited.

2. *Admission of expert testimony.* The defendant argues that the judge erred in allowing Officer LeBlanc to testify as a fingerprint expert at trial because he was not qualified to testify as he "was not trusted to tell the truth by either party." In support of this argument, the defendant points to an independent report generated by Ron Smith & Associates, Inc. (report), that verified that Officer LeBlanc had misidentified fingerprints in a prior criminal case and failed to disclose his error in the trial of that case. The defendant raised this contention below to the trial judge in a motion for a new trial. However, although he framed it in terms of ineffective assistance provided by his trial counsel, the judge discerned that "the claimed error is [the judge's] decision allowing [Officer] LeBlanc to testify both as a percipient witness and as an expert." The judge rejected the defendant's claim that his trial counsel's performance had been ineffective in opposing the testimony of Officer LeBlanc, finding that defense counsel had in fact been quite "adamant" in opposing the testimony. The judge's decision, insofar as subject to plenary review, is amply supported by the record.

The judge did not commit error by admitting Officer LeBlanc's expert testimony. Contrary to the defendant's contention, the Commonwealth and its "own consultants" did not exhibit a lack of "trust" of Officer LeBlanc. Without providing great detail regarding the specifics of the report, which was

---

[12]The absence of a limiting instruction at the time of the admission of the statement did not create a substantial likelihood of a miscarriage of justice in view of the strength of the Commonwealth's case. Even apart from the defendant's statements to Rivera, the defendant's fingerprint was found in the victim's blood at the apartment and the victim's blood was found in the wristband of the defendant's watch. Thus, the challenged testimony of the victim's daughter was not needed for the jury to draw a reasonable inference that the defendant had been with the victim before she died from her wounds.

impounded, the report did not undermine Officer LeBlanc's technical ability to examine and analyze fingerprint evidence, and the review team generating the report found that there had been no other erroneous identifications made by Officer Le-Blanc between 1995 and 2003 (which was the only time period examined). The report was not generated at the request of the district attorney, but rather the Boston police department. The Commonwealth had the defendant's fingerprint independently reexamined in 2004, and although that expert did not testify at trial,[13] he also found a "match." The defendant did not produce any evidence to the contrary. The Commonwealth notes that the mistaken fingerprint match in the past case could have resulted from a "mislabeling" mistake. Indeed, at the defendant's trial the prosecutor argued that defense counsel's accusation that Officer LeBlanc had committed perjury in connection with the past case was "overstating" what had occurred because other conclusions were possible. For these and other reasons, the record does not support the defendant's contention that the Commonwealth and its "own consultants" did not "trust" Officer LeBlanc.

Nor did the admission of Officer LeBlanc's expert testimony require a determination by the judge that he was trustworthy or credible as a witness. The defendant cites to no cases supporting this proposition. The test for the admissibility of expert testimony is as follows:

> "Under our common-law rules of evidence, the Commonwealth must establish five foundational requirements before expert testimony will be admitted in a criminal case: (1) that the expert testimony will assist the trier of fact, see *Commonwealth* v. *Little*, 453 Mass. 766, 768 (2009); (2) that the witness is qualified as an expert in the relevant area of inquiry, see *Commonwealth* v. *Frangipane*, 433 Mass. 527, 533 (2001); (3) that the expert's opinion is based on facts or data of a type reasonably relied on by experts to form opinions in the relevant field, see *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 531 (1986); (4) that the process or theory underlying

---

[13]Defense counsel obtained a ruling at trial excluding this witness's testimony because the prosecutor neglected to place his name on the witness list.

the opinion is reliable, see *Commonwealth* v. *Lanigan*, 419 Mass. 15, 26 (1994); and (5) that the process or theory is applied to the particular facts of the case in a reliable manner, see *Commonwealth* v. *Patterson*, 445 Mass. 626, 648 (2005). See generally Mass. G. Evid. § 702, at 218-224 (2010)."

*Commonwealth* v. *Barbosa*, 457 Mass. 773, 783 (2010), cert. denied, 131 S. Ct. 2441 (2011). The trustworthiness of an expert witness is not a foundational requirement, but a matter of credibility to be decided by the jury, subject to challenge, of course, by the defense. See *Commonwealth* v. *Shanley*, 455 Mass. 752, 762 (2010) ("Once admitted, the validity and credibility of the expert testimony is subject to challenge like any other testimony . . . and it is for the jury to determine what aid it might provide to their deliberations").

3. *The prosecutor's direct examination of Rivera.* On direct examination, Rivera testified that the defendant essentially confessed to the murder of his wife, although he never expressly stated that he had killed his wife.[14] Rivera's detailed testimony included information that (1) she had been contacted by "people"

---

[14]The following colloquy took place:

THE PROSECUTOR: "When you spoke to the defendant, can you tell us what you said to him, the beginning of the conversation?"

THE WITNESS: "At the beginning of the conversation, I had gone to the apartment to speak to him regarding the phone calls I had received and I wanted to speak to him about the phone calls I had received."

THE PROSECUTOR: "What did you say to him?"

THE WITNESS: "I had told him that the phone calls I had received were about a woman having been killed in Jamaica Plain and that several people were thinking and looking for him saying that he was the one who had killed the woman, and so that I wanted to hear it from him because when he had called me to ask me for a place to stay and he had told me that he had a problem, he hadn't told me specifically what the problem was."

THE PROSECUTOR: "When you said that to the defendant, what did the defendant say to you?"

THE WITNESS: "He got very nervous and he said . . . 'What's done is done and you cannot go back.' "

looking for the defendant in connection with a murder; (2) the "truth" relayed by the defendant was that he admitted that he

| | |
|---|---|
| THE PROSECUTOR: | "What did you say to the defendant?" |
| THE WITNESS: | "I told him to tell me the truth, that I needed to hear it from his mouth what he said he had done, what he said he had done and —" |
| THE PROSECUTOR: | "And when you said that to him, when you said that to the defendant you wanted to hear the truth about what he had done, how did the defendant respond?" |
| THE WITNESS: | "He told me he had had an argument with his wife and he started to tell me how the argument really happened, of what the argument — how the argument happened." |
| THE PROSECUTOR: | "What did the defendant say about the argument between himself and his wife?" |
| THE WITNESS: | "He told me they had been arguing about because he had been — she had found out that he had made another woman pregnant, and they had been arguing so hard that he had lost control of the argument." |
| THE PROSECUTOR: | "Did the defendant say what he did?" |
| THE WITNESS: | "And I told him . . . 'Is it true that you killed this woman?' And he lowered his head and I saw when he let out two tears." |
| THE PROSECUTOR: | "Did the defendant say what he did next?" |
| THE WITNESS: | "After that day?" |
| THE PROSECUTOR: | "Let me back up. After he put his head down, did he say something to you?" |
| . . . | |
| THE WITNESS: | "He repeated again what's done is done, you cannot walk back. What I need to do is give her a Christian burial." |
| THE PROSECUTOR: | "Did the defendant talk to you about going back to the apartment *after he killed her*?" (Emphasis added.) |
| THE WITNESS: | "Yes. He said he had gone back there but he was not able to get in because there were people around the house." |
| THE PROSECUTOR: | "Did the defendant say why he wanted to go back in the apartment?" |
| THE WITNESS: | "He specified to me that he wanted to get the corpse |

had fought with his wife the night of her murder about having impregnated another woman and that he lost control of that fight; (3) in response to Rivera's explicit question whether he had killed his wife, the defendant hung his head and said "what's done is done"; and (4) the defendant then told her that he needed to give his wife "a Christian burial." Following this testimony, the prosecutor asked Rivera whether the defendant talked to her "about going back to the apartment after he killed [his wife]," to which she responded that he relayed that he had tried to go back to the apartment but could not "get in because there were people around the house." Several questions later, the prosecutor asked Rivera whether the defendant told her "what day he killed his wife," to which she responded "[t]hat it had happened Thursday . . . ." The defendant claims that his trial counsel should have objected when the prosecutor incorrectly placed as the foundation for two of his questions that the defendant told Rivera he had "killed his wife."

The prosecutor should not have characterized the defendant's statements to Rivera as saying that he "killed his wife." The error, however, was isolated, occurring only twice, and without any objection. We point out that the judge, in both her preliminary remarks to the jury before opening statements and then again in her final charge, informed the jury that what the lawyers said and asked was not the evidence in the case and that they were to decide the case on the evidence. In addition, in his closing argument, defense counsel emphasized to the jury that Rivera did not actually tell the police that the defendant had "confess[ed]." Further, in view of the fact that the characterization (that the defendant had "killed his wife") could have been reasonably inferred from the defendant's statements to, and

---

out of the house, that's what he specifically told me, before the police would find it."

THE PROSECUTOR: "What day did he say that he went back to the apartment?"

THE WITNESS: "Friday."

THE PROSECUTOR: "Did the defendant tell you what day *he killed his wife*?" (Emphasis added.)

THE WITNESS: "That it had happened Thursday, Thursday in the afternoon."

conduct in the presence of, Rivera, were the jury to find her credible, we conclude that the prosecutor's error did not result in a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992). It follows that a claim of ineffectiveness of trial counsel based on defense counsel's failure to object to these two questions posed by the prosecutor would be unavailing.

4. *Prosecutor's closing argument.* The defendant claims that the prosecutor improperly "attack[ed]" defense counsel and made statements contradictory to the testimony of his own expert witness. "In analyzing a claim of improper argument, the prosecutor's remarks must be viewed in light of the 'entire argument, as well as in light of the judge's instruction to the jury and the evidence at trial.' " *Commonwealth* v. *Raposa*, 440 Mass. 684, 694 (2004), quoting *Commonwealth* v. *Rodriguez*, 437 Mass. 554, 565 (2002).

a. *Alleged "attack" on defense counsel.* On appeal, the defendant points to several remarks that the prosecutor made during his closing argument that he claims unfairly "attack[ed]" the qualifications and motives of defense counsel and urged the jury to get angry at defense counsel. The defendant specifically argues that the prosecutor improperly stated that (i) defense counsel had asked questions about illicit sexual relationships "over and over again to every female witness in this case," painting defense counsel as a "sadistic bully"; (ii) it was "easy" for defense counsel to sit in his office in New Hampshire and criticize a witness's actions; and (iii) defense counsel made a "baseless" and "heinous" accusation against the victim's son-in-law, which was "lawyer talk" and an "act of desperation."

(i) No substantial likelihood of a miscarriage of justice arose from the portion of the prosecutor's closing argument, to which defense counsel did not object, commenting on defense counsel's sexually implicit cross-examination of the female witnesses. See *Commonwealth* v. *Semedo*, 456 Mass. 1, 15 (2010). Even though the prosecutor misstated that defense counsel "asked [sexually implicit] questions over and over again to *every* female witness [emphasis added]," when in fact defense counsel had not asked such questions of the victim's daughter or the female forensic examiners, the comment was isolated and the judge had instructed

the jury that their memories of the evidence were to control. The jury are presumed to follow the judge's instructions. *Commonwealth* v. *Caldwell*, 459 Mass. 271, 278 (2011). To the extent that the isolated statement was exaggerated, it was merely "excusable hyperbole" and is not grounds for reversal. *Commonwealth* v. *Silva*, 455 Mass. 503, 515 (2009), quoting *Commonwealth* v. *Wilson*, 427 Mass. 336, 350 (1998). Nor did this isolated comment paint defense counsel as a "sadistic bully." Rather, the comment was a fair response to defense counsel's attack on Rivera's credibility when during her cross-examination he suggested that she fabricated the defendant's so-called confession to her because he had ended their sexual relationship.[15] See *Commonwealth* v. *Cohen*, 412 Mass. 375, 388 (1992) (not improper for prosecutor to comment on defendant's attempt to confuse or distract the jury by diverting their attention from strong evidence of defendant's guilt).

(ii) We also conclude that there was no merit in the defendant's argument that, when the prosecutor pointed out that defense counsel worked in New Hampshire, the prosecutor was trying to emphasize that defense counsel was a "foreigner" and that the vision of a "foreign" attorney criticizing everyone on behalf of his "foreign" client was xenophobic. The notion that the prosecutor was attempting to elicit xenophobia is unsupported by the evidence. The victim was an immigrant and several of the prosecutor's civilian witnesses appeared also to be immigrants. Early in the prosecutor's closing argument, he discussed the victim in positive terms, when noting the fact that she worked hard and came to this country as an immigrant.[16] At no point during the trial did the prosecutor try to elicit any sort of irrational dislike or fear of people from other countries.

Further, the prosecutor was responding to an argument made by defense counsel. See *Commonwealth* v. *Jackson*, 428 Mass. 455, 463 (1998) (prosecutor may comment on defense tactics

---

[15]Rivera denied ever having had a sexual relationship with the defendant and there was no other evidence at trial to suggest otherwise.

[16]The prosecutor stated: "[The victim] was [fifty-two] years old. She came to this country as an immigrant. She worked hard, and they bought a home. She raised a family. She spent her days working as a custodian, going to church, tending to her garden, and spending time with her extended family, her children, and her grandchildren across the street."

that jurors have witnessed themselves). In his closing argument, defense counsel suggested that the testimony of Rivera be discredited. When the prosecutor mentioned defense counsel's New Hampshire office, however, he was only asking the jury to recall that defense counsel had not been present at the time of the murder and had not had a friendship with the defendant similar to that of Rivera's relationship with the defendant. See *Commonwealth* v. *Szerlong*, 457 Mass. 858, 870-871 (2010), cert. denied, 131 S. Ct. 1494 (2011) (remarks made during closing arguments are considered in context of whole argument, evidence admitted at trial, and judge's instructions to jury). The prosecutor properly argued in his closing that defense counsel was in no position to judge the witness for the delay in her testimony against the defendant. See note 5, *supra.* Although the prosecutor's isolated reference to "the office in New Hampshire" was inartful, we conclude that there was no error in the statement and no substantial likelihood of a miscarriage of justice.

(iii) In his closing, defense counsel remarked: "I don't want for one minute . . . for you to think that I'm accusing anybody of anything." He then, however, suggested that the victim's son-in-law had something to do with her murder because he did not actually go inside the apartment physically to check on her himself when he saw her body on opening the door. Following defense counsel's insinuation of guilt of the victim's son-in-law, the prosecutor plainly stated that defense counsel's claim of not "accusing anybody" of the murder was disingenuous "lawyer talk." Moreover, defense counsel's accusation was not based in evidence, and the prosecutor's statement that the accusation against the victim's son-in-law was "hurtful" was merely a response to defense counsel's suggestions to the contrary. See *Commonwealth* v. *Jackson, supra.* To refocus the jury, the prosecutor argued that all of the evidence in the case pointed to the defendant, not to anybody else, and so the accusation against the victim's son-in-law was "ridiculous and absurd, and . . . an act of desperation in light of the overwhelming evidence." This argument was also a proper response to defense counsel's accusations in his closing argument. *Id.* See *Commonwealth* v. *Maldonado*, 429 Mass. 502, 508 & n.4 (1999) (prosecutor's

argument that defense counsel's closing was "riddled with smoke screens . . . designed to try to deter [the jury] from [their] mission of finding the truth" was not improper because "the prosecutor's comments were in response to defense counsel's attacks on the Commonwealth's case . . . claiming that it was the witness rather than the defendant that had committed the crimes").

b. *Statements allegedly contradicting expert testimony.* As previously noted, defense counsel elicited testimony during the cross-examination of two of the Commonwealth's witnesses who conducted various forensic examinations that there are no tests to determine how long blood has been deposited on an item. Defense counsel referred to this expert testimony in his closing argument, stating, "There was no telling how long the blood was on the doorknob." Later, in his closing argument, while referring to the defendant's bloody thumbprint found on the doorknob, the prosecutor remarked, "You can't tell when that got there? Of course, you can. Of course, you can." The defendant contends that these remarks contradicted the testimony of the Commonwealth's own witnesses and amounted to "a form of misrepresenting the evidence." We disagree.

The defendant improperly examines the remark in isolation. The statements immediately preceding the allegedly improper statement recount other evidence admitted at trial, including evidence about the voluminous amount of blood found inside the apartment and the limited access to the apartment, intimating a reasonable theory of how and when the defendant's thumbprint got on the victim's blood on a doorknob.[17] Moreover, the testimony from the two Commonwealth witnesses did not foreclose the timing of when the fingerprint was left by the

---

[17]The prosecutor stated: "[Y]ou have a bloody thumbprint at the crime scene . . . . Access to that apartment is limited through that little back door which was locked when [the victim's son-in-law] arrived, and the only other way out is through that door — side door where the bloody thumb print was found.

"You can see for yourself . . . the bloody trail that the defendant left behind from that doorknob in the basement up the steps to the doorknob upstairs and to the door frame on the way out the door. A bloody thumb print, her blood, his thumb print on that door.

"You can't tell when that got there? Of course, you can. Of course, you can."

defendant as suggested by the prosecutor. A prosecutor is "permitted and expected to marshal the evidence and to argue for a decision of the controversy in favor of his client." *Commonwealth* v. *Johnson*, 374 Mass. 453, 459 (1978). The prosecutor suggested that the jury make a permissible inference that was based in the evidence. See *Commonwealth* v. *Kater*, 432 Mass. 404, 422 (2000). There was no error.

5. *Jury instructions.* In her final charge, during her instruction on circumstantial evidence and equally reasonable inferences, the judge stated: "With respect to any inference which is adverse to the defendant, you may not draw such an inference unless you are persuaded of the truth of that inference beyond a reasonable doubt. If in assessing the evidence there are two reasonable inferences which can be drawn from the same set of facts, one of which is consistent with guilt and one of which is equally consistent with innocence or one of which is equally consistent with guilt, because of the presumption of innocence, you must draw the inference that is consistent with guilt." Telling the jury that, in the case of an equally consistent inference, they must draw the inference consistent with guilt was erroneous. The defendant argues that this error permitted the Commonwealth to gain an "advantage" with regard to equally consistent inferences because it required the jury to select the inference consistent with guilt.

"Error in a charge is determined by reading the charge as a whole, and not by scrutinizing bits and pieces removed from their context." *Commonwealth* v. *Petetabella*, 459 Mass. 177, 184 (2011), quoting *Commonwealth* v. *Cundriff*, 382 Mass. 137, 153 (1980), cert. denied, 451 U.S. 973 (1981). Because the defendant did not object to the charge on this ground at trial, we review to determine whether the error created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Sunahara*, 455 Mass. 832, 836 (2010). "This determination turns on whether a reasonable juror could have used the instruction incorrectly." *Id.* Throughout the judge's lengthy charge she gave extensive instruction on the presumption of innocence and the Commonwealth's burden of proof beyond a reasonable doubt. The judge's slip of the tongue was isolated and could not have created a substantial likelihood of a miscarriage of justice.

Earlier in the charge, the judge had instructed the jury that they "may not draw any inference adverse to the defendant unless [they were] satisfied of that inference beyond a reasonable doubt." This instruction was more than the defendant was entitled to receive. *Commonwealth* v. *Edwards*, 444 Mass. 526, 543 (2005) (although Commonwealth must prove all elements of crime "beyond a reasonable doubt," preliminary questions of fact and subsidiary facts need only be proved by preponderance of evidence). She repeated this beneficial instruction just prior to her slip of the tongue. When viewed in context and in relation to the charge in its entirety, the judge's isolated misstatement would not have made logical sense to a reasonable juror. Further, any confusion following the erroneous slip of the tongue would have been resolved when the judge later instructed that "[a]ll of the presumptions of law and of evidence are in favor of innocence and every person is presumed to be innocent until he is proven guilty."

6. *Cumulative effect of errors.* The defendant argues that we should consider the cumulative effect of errors in his case. In so doing, see, e.g., *Commonwealth* v. *Guy*, 441 Mass. 96, 109 (2004), we conclude that there was no substantial likelihood of a miscarriage of justice.

7. *Review pursuant to G. L. c. 278, § 33E.* Although the defendant does not advance an argument pursuant to G. L. c. 278, § 33E, we have examined the record and discern no basis to exercise our authority to set aside or reduce the verdict of murder in the first degree.

*Judgment affirmed.*