Filed 6/17/20

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C082186 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF155128) |
| v. | |
| JESSIE RENEAUX, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Yolo County, David Rosenberg, Judge. Affirmed in part and remanded in part.

Gordon S. Brownell, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Kathleen A. McKenna, Supervising Deputy Attorneys General, F. Matt Chen, Deputy Attorney General, for Plaintiff and Respondent.

## SUMMARY OF THE APPEAL

A jury found defendant, Jessie Reneaux, guilty of inflicting corporal injury on his girlfriend, L.E., with whom he was cohabiting, guilty of false imprisonment of his girlfriend, and guilty of dissuading his girlfriend from testifying against him. He appeals arguing that: 1) the trial court violated his right to confront witnesses against him by allowing the girlfriend's out of court testimonial statements to be admitted into evidence; and, 2) the trial court abused its discretion when it imposed consecutive rather than concurrent terms.

We hold the defendant forfeited by his own wrongdoing his Sixth Amendment right to confront and cross-examine L.E. and we hold that the trial court did not abuse its discretion in sentencing the defendant to consecutive prison terms.

In supplemental briefing, defendant contends in light of the recent passage of Senate Bill No. 1393 (SB 1393), this matter must be remanded to permit the trial court to consider whether it should exercise its newly-legislated discretion to strike or dismiss the prior serious felony conviction enhancements imposed under Penal Code section 667, subdivision (a) - statutory section references that follow are to the Penal Code unless otherwise set forth. The People correctly agree.

We affirm the judgment of conviction but remand the matter to the trial court for the limited purpose of allowing the trial court to exercise its sentencing discretion under sections 1385 and 667, subdivision (a) to strike or dismiss the prior serious felony conviction enhancements.

## FACTS

Defendant began living with his girlfriend L.E. in June 2015. Their landlord, Robert Clark, lived in a separate building on the same lot. From June to August, Clark grew concerned for E.'s safety because he would hear incidents of arguing, banging, shouting, "and stuff."

On August 13, Officer David Gonzalez responded to a call of vandalism at the property. While there, he spoke with E. She was crying and very emotional. Once she regained her composure, E. informed Gonzalez she and defendant had gotten into an argument while she was getting ready to go to work. He became very angry, threw things around the house, and punched a hole in the wall. As she went to get in her car to leave and go to work, defendant followed her and continued yelling at her. When she got in her car, he punched the windshield and cracked it, he punched the roof and dented it, and got into the car and damaged the ignition. She felt she was not able to leave. She told Gonzalez she was afraid for her life and did not want defendant to hurt her. She called friends to come help her and defendant left. Gonzalez's partner, Corporal Ramos, tried to start the car and it did not start.

About two weeks later, in the early morning of August 28, Clark again heard shouting and banging from defendant's apartment. His daughter called law enforcement to report the disturbance. Officer Hermosillo went to the apartment, knocked loudly on the door and announced himself, but no one answered. He had dispatch attempt to call the reporting party, but they were not able to reach her.

E. had arrived home around 3:00 a.m., and defendant was in the bedroom writing a letter. She walked into the bedroom and he yelled at her, "Fucking bitch. I fucking hate you." He got up, grabbed her, and pushed and pulled her around the apartment. Eventually, E. went into the bedroom, laid down, and cried. Later, when officers arrived at the apartment, defendant saw them through the window. He grabbed E., held her down, put his hand on her mouth, and told her to shut up. This is why she did not respond when Hermosillo knocked on the door. Defendant then punched holes in the wall, used a knife to cause additional damage, threw E.'s belongings out the window, and screwed the door closed. E. was afraid for her safety and felt trapped.

The next morning, Clark went to the apartment for a maintenance call. When he called and later knocked on the door, neither defendant nor E. answered. Clark was

3

concerned, particularly in light of the disturbance the night before, and he called the police. Eventually, defendant and E. answered the door. Clark saw bruising on E. and asked defendant about damaging the apartment. Clark told the 911 dispatcher that when officers came out the night before, defendant prevented E. from answering the door, and she now had bruises on her arm. He stated she wanted to file a report and document the assault. He also told dispatch that defendant had walked off when he had been confronted about damage to the apartment. After the officers arrived, E. answered the door. She appeared in distress, had bruises on her arm, and reported her jaw was sore because defendant had been preventing her from allowing officers entry into the apartment.

Officer Hatcher was one of the officers who went to the property after Clark's call. Hatcher noticed E. had visible bruising on her arms and jaw line. She appeared scared, hesitant, and uncomfortable. Based on the events as E. reported them, and her statement that she was afraid for her safety, Hatcher helped her obtain an emergency protective order.

On September 2, 2015, E. reported to law enforcement that defendant had come to the house, trying to "make peace" before turning himself in. She reported they argued prior to him leaving.

Defendant was arrested on September 9, 2015.

On September 9, 2015 and again on January 9, 2016, defendant called E. from the jail. The pertinent details of those calls are set forth, *post*.

On September 22, 2015, E. requested a copy of the police report from August 28. Sometime within two weeks after defendant's arrest, E. called Hatcher and left a voicemail. When Hatcher spoke with E., E. stated she wanted to change the report and that what Hatcher had written down was not exactly what had happened. She did not elaborate further. Also on September 22, 2015, E. called the district attorney's office to say she had lied and was told to call the police.

4

E. refused to testify at trial.

## LEGAL PROCEEDINGS

An information charged defendant with dissuading a witness (§ 136.1 - count 1); two counts of false imprisonment (§§ 236 & 237, subd. (a) - counts 2 & 4); infliction of corporal injury on a cohabitant (§ 273.5, subd. (a) - count 3); and, vandalism (§ 594, subd. (a)(1) - count 5).  The information also alleged a repeat offender enhancement as to count 3 (§ 273.5, subd. (e)(1)), that defendant had a prior strike conviction (§ 667, subds. (c) & (e)(1)), a prior serious felony conviction (§ 667, subd. (a)(1)) and had served a prior prison term (§ 667.5, subd. (b)).

A jury found defendant guilty on counts 1 through 3 but was unable to reach a verdict on counts 4 and 5.  In bifurcated proceedings, the trial court found all the enhancement allegations true.

The trial court sentenced defendant to an aggregate term of 21 years four months as follows:  the midterm of four years, doubled for the strike to eight years, for inflicting corporal injury with a repeat offender allegation, in count three, as the principal term; the midterm of three years, doubled for the strike to six years, for his conviction of dissuading a witness in count one; a consecutive term of eight months, one-third of the midterm, doubled for the strike to one year four months, for false imprisonment in count two, plus a sentence enhancement of five years to be served consecutively for a prior serious felony conviction.  The court added a consecutive one-year term for the prior prison term enhancement.

5

DISCUSSION

I

*Forfeiture-by-Wrongdoing*

Defendant contends the admission of E.'s hearsay statements made to law enforcement violated his Sixth Amendment right to confront the witnesses against him. He contends the trial court erred in finding the doctrine of forfeiture by wrongdoing applied which rendered these statements admissible, as there was not substantial evidence he intended to make E. unavailable to testify and the independent advice of her court appointed attorney is what caused her refusal to testify.

A.      *Procedural Background*

The People filed a motion in limine seeking to admit E.'s statements to Hatcher and Gonzalez. The People argued defendant had forfeited his confrontation rights by discouraging the victim from attending hearings and encouraging her to call authorities and claim she had lied in her previous reports; that is, forfeiture by wrongdoing. Attached to the motion were transcripts of two jail calls from defendant to E.

Exhibit A was a portion of the September 9 phone call referred to above. Exhibit B was an excerpt from the conversation between defendant and E. on January 9, 2016.

1.      The September 9, 2015 Call

The transcript of this call (Exhibit A) set forth the following:

"[Defendant]: You need to call, baby, and say you made another false report, that's it.

"[E.]: OK.

"[Defendant]: And that this was all a fuckin' lie baby. Baby?

"[E.]: Alright.

6

"[Defendant]: That's the only way, I'm telling you, that's the only fuckin' thing you can do, baby. I'm telling you because I fuckin', baby, I wanna fuckin' marry you, and I wanna fuckin' be with you but[--]

"[E.]: I know baby.

"[Defendant]: If I go to fuckin' prison, [E.], and I don't have you anymore, baby, I don't wanna fuckin', I don't wanna fuckin' be out.

"[E.]: I know baby. You're not going. I'm gonna, I'm getting you out.

"[Defendant]: Baby, for real.

"[E.]: Huh?

"[Defendant]: Look at me baby. You're the only place I wanna fuckin' be, baby, is in your fuckin' arms.

"[E.]: I know baby.

"[Defendant]: C'mon [E.]. Go fuckin' do this baby.

"[E.]: I will. I'm going to do it tomorrow morning, I promise."

### 2.      The January 9, 2016 Call

Exhibit B was a selected transcript of a second call on January 9, 2016:

"[Defendant]: So you got me though?

"[E.]: For sure.

"[Defendant]: Alright, I love you babe.

"[E.]: No worries. I love you too. Alright, I'm coming, am I gonna come to see you? Can I come see you like Tuesday or something?

"[Defendant]: No.

"[E.]: Huh?

"[Defendant]: What?

"[E.]: I'm gonna come see you Tuesday or something[.]

"[Defendant]: No.

7

"[E.]: Why?

"[Defendant]: What do you mean, 'why?'

"[E.]: Well what's Tuesday? Is it on Wednesday?

"[Defendant]: I have court Tuesday, Wednesday and Thursday.

"[E.]: That . . . it says the 14th.

"[Defendant]: I got court Tuesday, Wednesday, Thursday.

"[E.]: Well, my paper says the 14th.

"[Defendant]: Well, what does that mean?

"[E.]: Well, I didn't know, I just figured . . . so you have it for three days? That's ridiculous.

"[Defendant]: Yeah.

"[E.]: Oh, I didn't know that."

The People argued in the September 9 call, defendant attempted to interfere with the justice system by encouraging E. to recant and in the January 9 call defendant suggested she should not appear for court at the upcoming trial readiness conference on January 14.

In arguing the motion, the People noted E. had been subpoenaed for a trial readiness conference on January 14 and failed to appear. A warrant had been issued and law enforcement had been unable to find her.

Defense counsel argued E. in fact lied and made a false report, and defendant was not threatening her, but asking her to correct the record. Counsel also argued there was no inference of a threat, intimidation or coercion for E. to not come to court.

The trial court ruled the hearsay statements to Gonzalez and Hatcher were admissible pursuant to the forfeiture by wrongdoing doctrine.

Later in the hearing, E. appeared in court with appointed conflicts counsel, attorney Spangler. (The record does not reflect attorney Spangler's first name.) Spangler told the court that E. was not willing to testify. Spangler said she would be asserting her

8

Fifth Amendment privilege against self-incrimination because the prosecution could not offer her "effective immunity since there's nothing to preclude them from charging her with perjury based on whatever testimony she gives. [¶] . . . if they don't believe she testified truthfully." Spangler also said that even with immunity, E. would not testify.

At the People's request, the trial court held an Evidence Code section 402 hearing. E. took the witness stand, gave her name and date of birth, and refused to answer any other questions. The People said they would offer her "use immunity." She continued to refuse to answer questions. Spangler stated, "she's not going to answer any questions period. That's her instruction to me. However on the legal side of this there is no warranty from the prosecution, nor can there be, that if they believe she does not testify truthfully that she would not be prosecuted for perjury. The prosecution cannot immunize her from perjury, and she has no control over what they believe is perjury or not." The trial court clarified, even if she were given an "all encompassing" immunity, she would not testify. Spangler stated, "That is correct, and those are her instructions to me." Given E.'s refusal to testify, even with a grant of immunity, the trial court held her in contempt of court.

The prosecution called E. as its first witness. She answered a few general questions about where she lived. When asked where she was living in August 2015, she answered, "On the advice of my counsel, I claim the Fifth Amendment. I'm not answering any more questions." The People indicated they were willing to offer her a grant of immunity. E. continued to claim her Fifth Amendment privilege. The trial court found the privilege did not apply and ordered her to testify. She refused. The trial court instructed the jury E. did not have the right to refuse to testify and they could consider that fact in their deliberations.

B.      *Standard of Review*

Our standard of review is de novo as to those parts of the appeal that raise questions of law and mixed questions of law and fact. "In the constitutional realm . . . [the United States Supreme Court has] often held that the role of appellate courts 'in marking out the limits of [a] standard through the process of case-by-case adjudication' favors de novo review even when answering a mixed question primarily involves plunging into a factual record. [Citations.]" (*U.S. Bank N.A. v. Vill. at Lakeridge, LLC* (2018) __ U.S. __ [200 L.Ed.2d 218, 227, fn. 4], italics omitted.)

We defer to the trial court's findings of fact and, on review, we apply the substantial evidence standard to those factual findings. (*U.S. Bank N.A. v. Vill. At Lakeridge, LLC, supra,* __ U.S. __ [200 L.Ed.2d at p. 227]; see *People v. Kerley* (2018) 23 Cal.App.5th 513, 559; *People v. Banos* (2009) 178 Cal.App.4th 483, 486, *People v. Cromer* (2001) 24 Cal.4th 889, 900 [when reviewing prosecution's failed efforts to locate a missing witness, historical facts are subject to substantial evidence review]; *People v. Majors* (1998) 18 Cal.4th 385, 417 [when reviewing for juror misconduct, credibility determinations and findings on questions of historical fact subject to substantial evidence review]; *People v. Jones* (1998) 17 Cal.4th 279, 296 [when reviewing voluntariness of confession, details of interrogation are subject to substantial evidence review]; *People v. Alvarez* (1996) 14 Cal.4th 155, 182 [when reviewing denial of motion to suppress, court's findings on historical fact are reviewed for substantial evidence].)

In this case, the resolution of this matter is predominantly factual. The primary legal questions, whether the statements were testimonial and whether E. was unavailable (*People v. Nelson* (2010) 190 Cal.App.4th 1453, 1466; *Cromer*, *supra*, 24 Cal.4th at pp. 896-901), are undisputed by the parties. The facts of the content of the phone calls and E.'s refusal to testify are also undisputed.

The dissent raises a legal question we must resolve, that is, whether the rule of forfeiture by wrongdoing applies in light of the evidence adduced at trial. We address that question, *post*.

We must uphold the trial court's factual findings if the record contains evidence that is reasonable, credible and of solid value. (See *People v. Johnson* (1980) 26 Cal.3d 557, 577–578.) The substantial evidence standard "is deferential: 'When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination . . . .' [Citation.]" (*People v. Superior Court* (*Jones*) (1998) 18 Cal.4th 667, 681, fn. omitted, italics omitted.)

Here, at least one fact was in dispute—defendant's intent. (See *People v. Maciel* (1925) 71 Cal.App. 213, 218 [specific intent is a question of fact].) The court had to decide whether defendant by his statements in the phone calls intended to dissuade the witness from testifying against him. Defendant argued in the trial court that his statements had two possible interpretations. Either he was trying to persuade the witness to recant her statements to the police and now tell a lie, as the prosecution argued, or he was criticizing her for lying and was trying to persuade her now to tell the truth. Defendant argued it was the latter of the two interpretations; he intended for the witness to talk with law enforcement and cooperate, not absent herself from trial. As noted earlier, the court found defendant intended to dissuade the witness from testifying.

C.    *Analysis*

The Confrontation Clause bars admission of testimonial hearsay unless "the declarant is unavailable" and "the defendant has had a prior opportunity to cross-examine." (*Crawford v. Washington* (2004) 541 U.S. 36, 59 [158 L.Ed.2d 177] (*Crawford*).)

11

But a defendant's confrontation rights are subject to certain exceptions, including forfeiture by wrongdoing, which allows admission of unconfronted testimonial statements "where the defendant ha[s] engaged in wrongful conduct designed to prevent a witness's testimony." (*Giles v. California* (2008) 554 U.S. 353, 366 [171 L.Ed.2d 488] (*Giles*).)

"In *Giles*, the court held that the doctrine of forfeiture by wrongdoing permits admission of unconfronted statements of an unavailable witness only if the trial judge finds by a preponderance of the evidence that the defendant by a wrongful act made the witness unavailable with the intent of preventing the witness from testifying. (*Id*.[, 554 U.S.] at pp. 358-368.) The goal of the doctrine was to remove the 'otherwise powerful incentive for defendants to intimidate, bribe, and kill the witnesses against them—in other words, it is grounded in "the ability of the courts to protect the integrity of their proceedings." ' (*Id*. at p. 374.)" (*People v. Kerley, supra,* 23 Cal.App.5th at pp. 549–550.)

This doctrine is codified in California Evidence Code section 1390, which provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement is offered against a party that has engaged, or aided and abetted, in the wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness."

The underlying factual issues to be resolved by the trial court in applying the forfeiture by wrongdoing doctrine include: (1) whether by his wrongful conduct the defendant caused a witness to be unavailable to testify; and (2) whether the defendant intended to cause the witness to be unavailable. (*Giles, supra*, 554 U.S. at pp. 358-360; *Banos*, *supra*, 178 Cal.App.4th at p. 502.)

About a week before he was arrested, defendant went to E.'s apartment and spoke with her to "make peace." On the day he was arrested, he called E. from jail. He told her she needed to call law enforcement and tell them she had made a false report. She agreed

12

to make the call. He continued, that she needed to tell law enforcement it was all a lie. She agreed to tell them that. He told her it was "the only way," the only thing she could do, because he wanted to marry her, and if he went to prison he would not have her anymore. She promised she would get him out. He told her in his arms was the only place he wanted to be. He urged her to "fuckin' do this baby." She again promised she would.

Shortly after that phone call, E. contacted the police department and told them she wanted to change her story, and what they had in their report was not accurate. She also contacted the district attorney's office and informed them she had lied in the report. Although E. had earlier contact with law enforcement after the incident between herself and defendant, she did not indicate she wanted to recant her statements or had lied in her statements until after the September 9 phone call with defendant; a phone call in which he encouraged her to not cooperate with law enforcement and cajoled her by promising to marry her, but only if she could get him out of jail by not cooperating with law enforcement. It was reasonable to infer from this evidence, that defendant's statements telling her not to cooperate with law enforcement and promising to marry her but only if she got him out of jail were intended to, and did, cause E. to recant her statements to law enforcement, and later, to refuse to testify despite a grant of immunity.

A trial readiness conference was scheduled for January 14, 2016. On January 9, 2016, the Saturday before the trial readiness conference, defendant called E. again. Although the trial court was not particularly persuaded by this phone call, in our substantial evidence review, we are not precluded from considering this evidence in determining whether substantial evidence supports the trial court's finding. Our task is not to decide whether the trial court's decision is the only reasonable outcome given the facts. Rather, we must decide whether, viewing the facts in the light most favorable to the decision, a rational decision maker could find as the trial court did. (See *People v. Johnson, supra*, 26 Cal.3d at pp. 576-577.)

In the January 9th call, defendant confirmed with her, "you got me, though?" She assured him she did. They discussed his upcoming court dates, she told him her "paper" told her the date was the 14th. He asked what that meant, and she said she did not know. He then asked if she remembered what he told her. She said she knew, "no worries."

It is a reasonable inference that the "paper" E. was referring to in the January phone call was the subpoena which had been issued for her to appear at that January trial readiness conference. It is also a reasonable inference that defendant's inquiry whether E. "had him," his challenge to what the reference to the subpoena meant, and his question whether she remembered what he had told her, were intimations that she not appear at the hearing. And, she did not appear at that hearing.

E. remained unavailable until after the trial court ruled her prior statements to Gonzalez and Hatcher were admissible under the forfeiture by wrongdoing doctrine. At that point, she appeared and made clear through counsel she would not testify, even with a grant of immunity. Counsel repeatedly indicated E. had instructed *him*, she was not going to answer any questions. The trial court held her in contempt of court and required her to go to counseling. Upon return to court, E. continued to state she refused to testify, irrespective of a grant of immunity.

The trial court, upon being asked to reconsider its earlier evidentiary ruling, again found there was sufficient evidence defendant intended to dissuade the witness from testifying. The trial court also found E.'s current refusal to testify, even with a grant of immunity, reinforced its earlier conclusion that defendant's conduct was the cause of her refusal to testify, i.e. her unavailability. The trial court spoke with E.'s counsel again, and counsel reiterated that irrespective of his advice and the grant of immunity, E. had no intention of testifying. When the trial court found E.'s claim of Fifth Amendment privilege invalid and ordered her to testify, E. continued to refuse to testify and claim a Fifth Amendment privilege.

14

On the record before us and given the above, we find there is substantial evidence to support the trial court's ruling that defendant caused, and intended to cause, E.'s unavailability as a witness and her refusal to testify against him at trial. Defendant therefore forfeited by his own wrongdoing his claim that his constitutional right to confront the witnesses against him was violated in this trial.

Our dissenting colleague protests that in this matter, there is insufficient evidence of wrong-doing on defendant's part, where defendant engaged only in cajoling but nonthreatening behavior, noting that the majority of cases in which the doctrine has been applied has involved violence or threats of violence toward a witness or a similar type behavior. Specifically, the dissent is of the opinion that this cajoling and urging is not comparable to the conduct other courts have found to constitute forfeiture of a constitutional right. Defendant's conduct, although arguably shameful and wrong, and even illegal such that the jury found him guilty of dissuading a witness after hearing the much longer version of the complete call recorded September 9, does not constitute wrongdoing of the nature contemplated by the doctrine at issue.

Our colleague concludes that extending the doctrine to exhortations to stop lying and to reveal false reports previously given, and to expressions of love and desire, no matter whether they appear contrived or genuine, would stretch the doctrine beyond its intended limits. The dissent does not explain what those intended limits are.

We recognize defendant's statements here were not explicitly threatening or directive. However, consistent with the broad construction of the elements required for the application of this doctrine, and the underlying purpose to prevent defendant from undermining the judicial process, we do not find such explicit behavior to be necessary. This view is particularly apt in the context of domestic violence offenses and abusive relationships, which typically include an element of inherent psychological coercion, and the reality that "[t]his particular type of crime is notoriously susceptible to intimidation or

15

coercion of the victim to ensure that [the witness] does not testify at trial." (*Davis v. Washington* (2006) 547 U.S. 813, 832-833 [165 L.Ed.2d 224].)

Whether a defendant's conduct constitutes "wrongdoing" depends not necessarily on its character, but on the defendant's intent and whether his actions caused the witness not to appear. It is true that most of the reported cases involving this exception to the Confrontation Clause involve serious criminal conduct, but that does not preclude courts from finding that nonthreatening conduct such as occurred here qualifies as wrongdoing under the appropriate legal standard where the defendant acted with the intent to procure the witness's absence from court.

In *Carlson v. Attorney General of California* (9th Cir. 2015) 791 F.3d 1003 (*Carlson*), the Ninth Circuit Court of Appeals explained the forfeiture-by-wrongdoing exception, the required showing of intent, and, of importance here, the type of action that constitutes wrongdoing. We quote *Carlson* at length:

"The forfeiture-by-wrongdoing doctrine is an exception to the Confrontation Clause's protections. That doctrine permits the introduction of a testimonial statement by an unavailable witness if the preponderance of the evidence shows that the 'witness is absent by [the defendant's] own wrongful procurement.' (*Reynolds v. United States* (1878) 98 U.S. 145, 158 [25 L.Ed. 244] [(*Reynolds*)]; *United States v. Johnson*[*, supra*, 767 F.3d at pp.] 822-823 (holding that forfeiture by wrongdoing must be proven by a preponderance of the evidence).

"The leading post-*Crawford* case on forfeiture by wrongdoing, *Giles*, explains that the rationale behind the rule is avoidance of 'an intolerable incentive for defendants to bribe, intimidate, or even kill witnesses against them.' (554 U.S. at p. 365.) Relying on that rationale, *Giles* rejected a theory of forfeiture by wrongdoing that would have permitted unconfronted testimonial statements to be admitted against a defendant any time the defendant had by his own culpable acts rendered the witness unavailable. (*Id.* at pp. 364-365, 368.) Explaining that the 'bad acts' theory could not be reconciled with 'the

16

common law's uniform exclusion of unconfronted inculpatory testimony by murder victims,' (*id.* at p. 368), *Giles* held that forfeiture by wrongdoing applies only where the defendant engaged in 'conduct *designed* to prevent a witness from testifying,' (*id.* at p. 365).

"As the parties here agree, *Giles* established the mens rea aspect of the forfeiture-by-wrongdoing exception: The defendant must *intend* that a witness be made unavailable to testify. Neither party's briefing, however, articulates a standard for the kind of action a defendant must take to effectuate that intent.

"Despite the parties' reticence, Supreme Court authority is as clear on the overt act point as on the mens rea question. The standard was articulated in the Court's first opinion applying the forfeiture-by-wrongdoing exception, *Reynolds,* [*supra,*] 98 U.S. 145, and cited approvingly in *Giles.* (See *Giles, supra*, 554 U.S. at p. 366; *see also Crawford, supra*, 541 U.S. at p. 62 (citing *Reynolds*).

"*Reynolds* explained that, 'as long ago as the year 1666,' in Lord Morley's Case, 6 How. St. Tr. 769, 771 (H.L. 1666), adjudicators had admitted statements of an absent witness who 'was detained *by the means or procurement of* the [defendant],' and that 'now, in the leading text-books, it is laid down that if a witness is *kept away* by the adverse party, his testimony . . . may be given in evidence.' (*Id.* at pp. 158-159 (emphasis added) (citing evidence textbooks). *Reynolds* concluded that, in that case, the state had proven enough to shift the burden to the defendant to show that he was not 'instrumental in concealing or keeping the witness away.' (*Id.* at p. 160.)

"Well over a century later, *Davis* and *Giles* reaffirmed that the Confrontation Clause does not protect statements by a witness kept from testifying 'by the means or procurement of the [defendant].' (*Giles, supra*, 554 U.S. at p. 359 (internal quotation marks omitted); see also *Davis*[*, supra,*] 547 U.S. at p. 833 (describing a defendant who 'procur[es] or coerc[es] silence from witnesses . . . who obtains the absence of a witness by wrongdoing'). In examining what 'means or procurement' signifies, *Giles* cited

17

dictionaries defining 'to procure' as, inter alia, 'to *contrive* and effect'; 'to get . . . as by request, loan, effort, labor or purchase'; 'to contrive or devise with care . . .; to endeavor to cause or bring about.' (*Giles*[, *supra*,] 554 U.S. at p. 360 (internal quotation marks and alteration omitted).

"The pertinent Supreme Court authority, then, clearly establishes that the forfeiture-by-wrongdoing doctrine applies where there has been *affirmative action on the part of the defendant that produces the desired result*, non-appearance by a prospective witness against him in a criminal case. Simple tolerance of, or failure to foil, a third party's previously expressed decision either to skip town himself rather than testifying or to prevent another witness from appearing does not 'cause' or 'effect' or 'bring about' or 'procure' a witness's absence." (*Carlson, supra*, 791 F.3d at pp. 1009-1010, original italics except for the last set, fns. omitted.)

This standard of wrongdoing is broad. The defendant's affirmative action need not be criminal or even threatening. Rather, the action becomes "wrongdoing" because the defendant acted with the intent to interfere with the court's truth-finding function and his action caused the witness not to appear.

The *Carlson* court applied the standard to the facts before it on a habeas petition. The defendant was charged with assaulting his child. At trial, the defendant's wife and child, although subpoenaed to testify, did not appear. The trial court invoked the forfeiture-by-wrongdoing exception and admitted the wife's and child's prior statements to police. The Ninth Circuit Court of Appeals held it could not say the state court's decision was unreasonable. (*Carlson, supra*, 791 F.3d at pp. 1004-1005.) The evidence showed that the wife was distraught and would require emotional care, the defendant was not at home on the nights during trial when his wife and child were also not home, and the defendant had instructed the other children not to call their mother. (*Id.* at p. 1012.) From this evidence, the trial court could infer that the defendant knew where his wife and child were and was with them when they were absent, he wanted to keep their

18

whereabouts secret, so they could not be compelled to appear, and he wished to keep his wife away from any influence that might persuade her to reappear. (*Ibid*.)

The Sixth Circuit Court of Appeals has also applied a broad standard like that announced in *Carlson* and *Reynolds*. In *Steele v. Taylor* (6th Cir. 1982) 684 F.2d 1193 (*Steele*), disapproved on another point in *Burns v. Estelle* (5th Cir. 1983) 695 F.2d 847, a prostitute to Owen, one of the defendants in a conspiracy to commit murder, informed the FBI of the defendants' statements regarding the murder. By the time of trial, the witness was living with Owen and had given birth to a child. The defense used a combination of tactics to prevent the witness from testifying. Owen obtained a lawyer for her, and his lawyer remained as the witness's co-counsel. The defense objected to her deposition based on the marital privilege. The court ordered the deposition go forward, during which the witness stated her previous statement to the FBI was false. The defense then sought to prevent her testimony at trial by claiming the deposition established marital privilege, she could assert her Fifth Amendment right, and her prior statement was false. The trial court overruled the objections and ordered the witness to testify. At trial, her lawyer, who was paid by Owen, stated the witness would not testify and he had counseled her not to do so. Relying on *Reynolds*, the trial court ruled that based on the evidence, the witness was under the control of the defendants who had procured her refusal to testify. The court admitted the FBI's testimony regarding the witness's earlier statement. (*Id*. at pp. 1197-1199.)

The Sixth Circuit Court of Appeals upheld the trial court's ruling on a habeas petition. Explaining the forfeiture-by-wrongdoing doctrine, the court stated, "The theory of the cases appears to be that the disclosure of relevant information at a public trial is a paramount interest, and *any significant interference with that interest, other than by exercising a legal right to object at the trial itself, is a wrongful act*. Wrongful conduct obviously includes the use of force and threats, but it has also been held to include *persuasion and control* by a defendant, the wrongful nondisclosure of information, and a

19

defendant's direction to a witness to exercise the fifth amendment privilege." (*Steele, supra*, 684 F.2d at p. 1201, fn. omitted, italics added.)  Applying the rule to the facts before it, the court held it could not say the state court committed constitutional error by inferring from the facts that the defendants acting in concert wrongfully induced the witness not to testify, even though there was no evidence of specific threats.  The defendants had jointly agreed that Owen would use his influence and control over the witness to induce her not to testify.  There was also evidence that the witness was afraid of Owen, he obtained her lawyer, and that lawyer advised her not to testify.  (*Id*. at p. 1203.)

To the extent that our dissenting colleague suggests that *Steele* may no longer be viable after *Crawford*, we disagree.  (Dis. opn. at pp. 3-4.)  *Steele* remains viable, as its holding was based on the wrongfulness of the defendants' actions, the standard upheld by *Giles*, not on any indicia of reliability on which hearsay was deemed admissible prior to *Crawford,* although it addressed the latter standard in the alternative.  (*Steele, supra*, 684 F.2d at p. 1203; see *United States v. Ponzo* (1st Cir. 2017) 853 F.3d 558, 579 [no reason why pre-*Crawford* forfeiture-by-wrongdoing case law is not valid under *Giles*].)

We further note that the *Crawford* opinion itself appears to have considered the concept of forfeiture-by-wrongdoing as lying outside the Sixth Amendment issues that the *Crawford* court addressed.  Thus, "[t]he *Roberts* test allows a jury to hear evidence, untested by the adversary process, based on a mere judicial determination of reliability. It thus replaces the constitutionally prescribed method of assessing reliability with a wholly foreign one.  *In this respect, it is very different from exceptions to the Confrontation Clause that make no claim to be a surrogate means of assessing reliability. For example, the rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; it does not purport to be an alternative means of determining reliability.*  [Citation omitted, emphasis added.]" (*Crawford, supra,* 541 U.S. at p. 62.)

20

There are three opinions, all from state courts, that address whether conduct like that which occurred here—nonthreatening and not in violation of a court order—qualified as wrongdoing. All three held the conduct was wrongdoing. One case occurred after *Giles*, the other two preceded it. In *Commonwealth v. Szerlong* (2010) 457 Mass. 858 (*Szerlong*), the Supreme Judicial Court of Massachusetts held that a defendant's agreement to marry the victim to enable her to claim the spousal privilege and not have to testify against the defendant was wrongdoing that forfeited the right to challenge admitting the victim's out-of-court statements. (*Id*. at pp. 864-866.) The marriage occurred after a warrant had been issued for the defendant's arrest but before the defendant surrendered to authorities, and the victim informed others she had married the defendant so she would not have to testify in his case. (*Id*. at pp. 859, 863-864.) The court relied in part on *Giles*, which stated that wrongdoing was " 'conduct designed to prevent a witness from testifying.' " (*Id*. at p. 863, quoting *Giles, supra*, 554 U.S. at p. 368.) There was no requirement that the conduct had to be criminal. The act constituted wrongdoing if the defendant agreed to marry the witness, and did marry her, with an intent to enable her to claim the spousal privilege. (*Szerlong, supra*, at pp. 863-865.)

*Commonwealth v. Edwards* (2005) 444 Mass. 526 (*Edwards*), also relied upon by *Szerlong*, held that wrongdoing may include a defendant's collusion with a witness when the defendant intends to ensure that the witness will not be heard at trial. (*Id*. at p. 540; *Szerlong, supra*, 457 Mass. at p. 863.) The offer of proof indicated the defendant in telephone calls from jail conspired with the witness and others to procure the witness's unavailability. (*Edwards, supra*, 444 Mass. at pp. 530-531.) The state supreme court, remanding the matter for an evidentiary hearing, held that colluding with a witness could qualify as wrongdoing. (*Id*. at p. 540.) "A defendant's involvement in procuring a witness's unavailability need not consist of a criminal act, and may include a defendant's

21

collusion with a witness to ensure that the witness will not be heard at trial." (*Ibid*., fns. omitted.)

The Iowa Supreme Court in *State v. Hallum* (2000) 606 N.W.2d 351 (*Hallum*) relied on jailhouse correspondence to hold the defendant had forfeited his Confrontation Clause right by wrongdoing. The defendant's half-brother was incarcerated for refusing to testify in defendant's case. In a letter, the defendant told his brother to "hang in there," as there were only two months left until defendant's trial. He did not think the trial court would admit the brother's recorded testimony. He told him to calm down and not discuss anything of importance on the phones. (*Id*. at pp. 356-357.) The brother replied by letter and told the defendant he "just can't handle it anymore," implying he would testify if defendant went to trial. (*Id*. at p. 357.) Relying on *Steele* and *Reynolds*, the state supreme court held the defendant procured the witness's unavailability at trial "by encouraging and influencing" him not to testify. (*Id*. at p. 358.)

These cases flesh out the broad *Johnson* standard. Depending on the facts, trial strategies, letters and phone calls from jail colluding or confirming that a witness will not appear, and even a marriage proposal may constitute wrongdoing for purposes of the forfeiture-by-wrongdoing doctrine if the defendant engaged in those actions with the intent to prevent the witness from testifying.

Defendant argues that his actions were only intended to have his victim "tell the truth" and say she made her entire story up. This is, of course, belied in no small part by the evidence of her physical bruising and other injuries observed by the law enforcement officers. The trial court did not credit this argument and there is substantial evidence to support that determination.

Defendant also argues that his actions did not result in E.'s refusal to testify, but instead it was E.'s attorney's advice to her that she not testify that caused her refusal. This argument is a non-starter, primarily because there is nothing in the record that shows that E.'s counsel advised her not to testify. To the contrary, as far as this record shows,

22

Spangler only advised E. of the possible consequences of her testifying or not testifying and the decision not to testify was solely hers. Thus, Spangler stated at one point that "she's not going to answer any questions period. That's her instruction to me" and, at another, in response to the court's question regarding the effect on E. of a prosecution grant of immunity and whether she would still refuse to testify, Spangler stated, "That is correct, and those are her instructions to me." While E. presumably listened to and considered her lawyer's explanations on the question of her refusal to testify, there is nothing in this record to demonstrate that Spangler ever told E. *not* to testify and the record shows that E.'s decision not to testify was her own.

There was no error.

## II

### *Consecutive Sentencing*

Defendant contends the trial court abused its discretion by sentencing him to consecutive rather than concurrent terms. He argues the offenses were part of one course of conduct whose objectives were related to each other, and not independent.

"[I]n the absence of a clear showing that its sentencing decision was arbitrary or irrational, a trial court should be presumed to have acted to achieve legitimate sentencing objectives and, accordingly, its discretionary determination to impose consecutive sentences ought not be set aside on review." (*People v. Giminez* (1975) 14 Cal.3d 68, 72.) "The trial court is required to determine whether a sentence shall be consecutive or concurrent but is not required to presume in favor of concurrent sentencing. [Citations.] If it has faithfully applied the sentencing rules, the only other question is whether, all circumstances considered, the trial court's decision exceeds the bounds of reason." (*People v. Reeder* (1984) 152 Cal.App.3d 900, 923.)

In making its decision, a trial court should consider, in part: "Facts relating to the crimes, including whether or not: [¶] (1) The crimes and their objectives were

23

predominantly independent of each other;  [¶]  (2) The crimes involved separate acts of violence or threats of violence; or  [¶]  (3) The crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior."  (Cal. Rules of Court, rule 4.425(a).)

Here, the trial court considered the probation report, the arguments of counsel, the victim's statements, statements from defendant's family members, defendant's age, and the extent of the injuries involved.  The court was aware of the full evidentiary record and facts of the case.  The court stated the criteria it was using in choosing consecutive terms, finding the acts were distinct acts.  This conclusion is both supported by the evidence at trial and comports with the California Rules of Court, quoted earlier.

Each violent crime may be punished separately in an appropriate case.  (See *People v. Harrison* (1989) 48 Cal.3d 321, 338 ["defendant should . . . not be rewarded where, instead of taking advantage of an opportunity to walk away from the victim, he voluntarily resumed his sexually assaultive behavior"]; *People v. Gaio* (2000) 81 Cal.App.4th 919, 935 [multiple punishment permitted "where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken"].)

The trial court could rationally find that defendant's act of grabbing and throwing E. around the apartment constituted inflicting personal injury on a cohabitant; thereafter, as she was lying in bed, he held her by the jaw and put his hand over her mouth to keep her from responding to law enforcement and dissuade her from speaking to them and reporting the assault; and then damaging the doors to prevent her from leaving the apartment thus, false imprisonment.  Each was a separate act meriting separate punishment.  On the record before us, this decision was not an abuse of discretion.

# III

## *Resentencing*

A.  Senate Bill 1393

Defendant argues in a supplemental brief that the passage of SB 1393 requires remand so that the trial court may exercise its discretion regarding the imposition of sentence for the prior serious felony conviction enhancement (§§ 667, subd. (a)), which was previously mandatory.  The People concur that remand is necessary "for the limited purpose of giving the trial court the opportunity to consider striking the prior serious felony enhancement pursuant to section 667[, subdivision (a).]"  We accept this concession and find SB 1393 retroactive as explained in *People v. Garcia* (2018) 28 Cal.App.5th 961.

"On September 30, 2018, the Governor signed Senate Bill 1393 which, effective January 1, 2019, amends sections 667(a) and 1385(b) to allow a court to exercise its discretion to strike or dismiss a prior serious felony conviction for sentencing purposes. (Stats. 2018, ch. 1013, §§ 1-2.)"  (*Garcia*, *supra*, 28 Cal.App.5th at p. 971.)

Under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), "[w]hen the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date."  (*People v. Brown* (2012) 54 Cal.4th 314, 323, fn. omitted.)  Nothing in SB 1393 suggests any legislative intent that the amendments apply prospectively only, thus "it is appropriate to infer, as a matter of statutory construction, that the Legislature intended Senate Bill 1393 to apply to all cases to which it could constitutionally be applied, that is, to all cases not yet final when Senate Bill 1393 [became] effective on January 1, 2019." (*Garcia*, *supra*, 28 Cal.App.5th at p. 973.)

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.] In such circumstances, [our Supreme Court has] held that the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' [Citations.]" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) The record before us does not clearly indicate that the trial court would have declined to strike one or more of defendant's prior serious felony convictions for sentencing purposes if it had the discretion to do so. Accordingly, we agree with the parties that remand is appropriate in this case to allow the trial court to exercise its discretion as to whether to strike one or more of his prior serious felony convictions for sentencing purposes.

B. Senate Bill 136

In a later supplemental brief, defendant contends the one-year prior prison term enhancement imposed pursuant to section 667.5, subdivision (b), must be stricken pursuant to the amendment to section 667.5, subdivision (b) by Senate Bill No. 136 effective January 1, 2020 (SB 136). The people concede the issue. We agree and modify the judgment accordingly.

Signed by the Governor on October 8, 2019, and effective January 1, 2020, SB 136 amends section 667.5, subdivision (b), to eliminate the one-year prior prison term enhancement for most prior convictions. (Sen. Bill No. 136, 2019-2020 Reg. Sess. § 1.) An exception, not applicable here, is made for a qualifying prior conviction on a sexually violent offense, as defined in Welfare and Institutions Code section 6600, subdivision (b).

26

Because SB 136 became effective before defendant's judgment became final, we agree with the parties that the amended law applies to him retroactively. (See *In re Estrada, supra,* 63 Cal.2d at pp. 744-745 [absent evidence of contrary legislative intent, ameliorative criminal statutes apply to all cases not final when statute takes effect].) Accordingly, both of defendant's 667.5 subdivision (b) enhancements must be stricken.

DISPOSITION

The judgment of conviction is affirmed. The matter is remanded to the trial court with directions to resentence defendant pursuant to sections 667 subdivision (a) and 1385 subdivision (b), as amended by SB 1393.

Further, we modify the judgment to strike defendant's 667.5 subdivision (b) enhancements. The superior court is directed to prepare an amended abstract of judgment and forward a certified copy of the same to the Department of Corrections and Rehabilitation.

 

 

 

 

HULL, Acting P. J.

 

 

I concur:

 

 

 

RENNER, J.

27

DUARTE, J., Dissenting

I respectfully disagree with the majority's apparent conclusion that supported findings of intent and causation are the only ingredients necessary for proper application of the forfeiture by wrongdoing doctrine. Although I agree that the doctrine at issue is valid, I cannot agree that the doctrine contemplates forfeiture of the right to confront witnesses without regard to the seriousness of a defendant's underlying conduct. Simply put, there must be wrongdoing that is not derived solely from findings of intent and causation before the doctrine may be properly applied. Here there was not. Because the error was not harmless, defendant's conviction should be reversed.

As the United States Supreme Court made clear in *Crawford* and as our own high court has recently reminded us in *People v. Sanchez* (2016) 63 Cal.4th 665 at pages 679 to 680, the right of the accused to confront witnesses against them is a "bedrock procedural guarantee" and should not be lightly disregarded (*Crawford v. Washington* (2004) 541 U.S. 36, 42 (*Crawford*)). In my view, "wrongfulness" resulting in forfeiture of a critical constitutional right requires more than the facts seen here, even assuming intent and causation were properly found. No reported case has found the doctrine applicable to the minimally invasive and indisputably nonthreatening conduct in this case. Although my colleagues appear to assume that a finding of wrongdoing necessarily follows where intent and causation are properly found, I disagree.

Evidence Code section 1390 provides in relevant part that:

"(a) Evidence of a statement is not made inadmissible by the hearsay rule if the statement is offered against a party that has engaged, or aided and abetted, in the wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.

"(b)(1) The party seeking to introduce a statement pursuant to subdivision (a) shall establish, by a preponderance of the evidence, that the elements of subdivision (a) have been met at a foundational hearing."

1

I read Evidence Code section 1390, subdivision (a) to require something beyond intent and causation; the elements that must be met per subdivision (b) are three: first is identifiable wrongdoing; second is intent to procure a witness's unavailability through that same wrongdoing; and third is achievement of unavailability through that same wrongdoing. Application of the doctrine requires "that the defendant *by a wrongful act* made the witness unavailable with the intent of preventing the witness from testifying." (*People v. Kerley* (2018) 23 Cal.App.5th 513, 549, italics added.) "One thing seems clear: causing a person not to testify at trial cannot be considered the 'wrongdoing' itself, otherwise the word would be redundant. So we must focus on the actions procuring the unavailability." (*United States v. Scott* (7th Cir. 2002) 284 F.3d 758, 763 [interpreting Federal Rules of Evidence, rule 804(b)(6) to require that: (1) the defendant engaged or acquiesced in wrongdoing; (2) the wrongdoing was intended to procure declarant's unavailability; and (3) the wrongdoing did procure the unavailability].)

Accordingly, I am compelled to dissent from the majority's conclusion that defendant's conduct during two telephone calls made four months apart resulted in forfeiture of his critical constitutional right to confront his girlfriend as she bore witness against him. (See *Crawford*, *supra*, 541 U.S. at p. 54 ["The text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts"].)

I

*Defendant's Conduct Does Not Rise To The Level Warranted To Forfeit A Critical Constitutional Right*

In making its ruling, the trial court here considered two brief excerpts of phone calls, separated by four months. One cajoled a witness to tell the police she "made another false report" about an unwitnessed assault and that "this was all just a [expletive] lie" (to which she seemed to willingly assent), and the other discussed the trial dates and referenced a subpoena. Defendant told the witness he loved her, wanted to marry her,

2

and wanted to be with her.  He urged her to stop lying and to reveal false reports previously given.  This conduct--two instances of nonthreatening cajoling and urging separated by four months, in the absence of a no-contact order--does not compare to the conduct other courts have found to constitute forfeiture of a bedrock constitutional right.

For the limited purpose of this dissent, I am willing to assume that the trial court's findings of defendant's intent and the subsequent causation are supported by substantial evidence.  My dispute with the majority centers on its conclusion that the trial court correctly concluded defendant's conduct during the recordings was "wrongdoing" in the *legally recognized sense*, such that it invoked the doctrine of forfeiture by wrongdoing.  I agree with the majority that this question merits de novo review.  (Maj. opn., p. 10.)

In the all-too-typical case involving forfeiture by wrongdoing, the defendant prevents a witness from testifying or cooperating with law enforcement by *killing* the witness before trial.  (See, e.g., *Giles v. California* (2008) 554 U.S. 353, 356; *People v. Kerley, supra,* 23 Cal.App.5th at pp. 556-557; *People v. Banos* (2009) 178 Cal.App.4th 483, 485; *United States v. Cazares* (9th Cir. 2015) 788 F.3d 956, 975; *United States v. Jackson* (4th Cir. 2013) 706 F.3d 264, 265; *United States v. Dhinsa* (2d. Cir. 2001) 243 F.3d 635, 652; *United States v. Cherry* (10th Cir. 2000) 217 F.3d 811, 814-815; *United States v. Emery* (8th Cir. 1999) 186 F.3d 921, 926; *United States v. Houlihan* (1st Cir. 1996) 92 F.3d 1271, 1279; *United States v. White* (D.C. Cir. 1997) 116 F.3d 903, 911.)  But on occasion the definition of wrongful conduct has been expanded to include threats, intimidation, and bribery.  (See, e.g., *United States v. Johnson* (9th Cir. 2014) 767 F.3d 815, 818 [death threats]; *People v. Jones* (2012) 207 Cal.App.4th 1392, 1399 [threat of violence] (*Jones*); *United States v. Jackson, supra,* 706 F.3d at p. 267, citing *United States v. Carlson* (8th Cir. 1976) 547 F.2d 1346, 1358-1359 [intimidation]; *State v. Mechling* (2006) 633 S.E.2d 311, 326 [physical violence]; *People v. Geraci* (1995) 649 N.E.2d 817, 823-824 [bribery].)  Where there is a history of domestic violence, repeated violations of court orders during jail visits and phone calls may also

3

constitute wrongful conduct. (See *United States v. Montague* (10th Cir. 2005) 421 F.3d 1099, 1102-1104.) Prior to *Crawford,* wrongful conduct had "also been held to include persuasion and control by a defendant, the wrongful nondisclosure of information, and a defendant's direction to a witness to exercise the fifth amendment privilege." (*Steele v. Taylor* (6th Cir. 1982) 684 F.2d 1193, 1201, disapproved on another point in *Burns v. Estelle* (5th Cir. 1983) 695 F.2d 847.)

Here, defendant displayed *none* of these tactics. As the majority agrees, defendant's conduct was neither threatening nor in violation of a court order. (Maj. opn., p. 21.) And although *Crawford* accepted the doctrine of forfeiture by wrongdoing as an equitable doctrine (see *Crawford*, *supra*, 541 U.S. at p. 62), the Court also reaffirmed therein the importance of the constitutional right to confront one's accuser by severely limiting those circumstances under which that right could be circumvented.[1] Regardless of the effect of *Crawford* on the doctrine at issue here, the majority has not cited (and I have not found) any case that has applied the doctrine to the type of conduct seen here, including *Steele*.[2]

---

[1] Courts have typically extended equitable relief only sparingly. (See *Irwin v. Department of Veterans Affairs* (1990) 498 U.S. 89, 96 [equitable tolling].)

[2] The Attorney General's briefing relies on language from *Jones*, *Giles*, *Banos*, and *Davis v. Washington* (2006) 547 U.S. 813. In *Jones*, the trial court listened to 10 hours of conversations recorded over 12 phone calls between defendant and the victim and applied the doctrine because defendant had implicitly threatened the victim. (*Jones, supra*, 207 Cal.App.4th at p. 1398.) In *Giles* and *Banos,* defendant murdered the victim. (*Giles v. California, supra*, 554 U.S. at p. 356; *People v. Banos*, *supra,* 178 Cal.App.4th at p. 485.) In *Davis*, the issue was whether the statements given by the victim to law enforcement at a crime scene were testimonial subject to the requirements of the Confrontation Clause. (*Davis*, at p. 817.) *Davis* took "no position on the standards necessary to demonstrate [forfeiture by wrongdoing]" and did not analyze or apply the doctrine, but merely noted at its conclusion that the state court could consider its application on remand if asked to do so. (*Id.* at pp. 833, 834.)

The majority discusses *Steele* at length, using language from the case to describe the "broad standard" it applies (maj. opn., p. 19) to extend the category of "wrongful conduct" beyond force and threats to persuasion and control (maj. opn., p. 20), and suggests we should do the same here. But the facts in *Steele* constituting the requisite "persuasion and control" are nothing like the facts of the case before us. In the case at hand, defendant participated in two short telephone calls four months apart. In *Steele* the defendant lived with and impregnated the witness while awaiting trial, secured and paid for her attorney, installed his own attorney as her cocounsel, and made numerous manipulative pretrial maneuvers over a period of many months to ensure she did not testify. (Maj. opn., pp. 19-21; see *Steele v. Taylor*, *supra*, 684 F.2d at pp. 1197-1199, 1203.)

In *Carlson v. Attorney General of California* (9th Cir. 2015) 791 F.3d 1003, quoted at length by the majority, the evidence of the defendant's interference with his child (the victim/witness) and his wife (a witness) extended to the defendant's secreting the two away from home and away from any influences, staying with them at the hiding place, and telling the other children not to call their mother while she was away. (*Id.* at p. 1012.) Finding that the "circumstances demonstrate both concealment of the witnesses' whereabouts and insulation of the witnesses from the reach of either compulsion or persuasion regarding showing up at trial," the *Carlson* court concluded the trial judge's application of the doctrine was not unreasonable. (*Id.* at p. 1013.) That conduct is not at all comparable to defendant's actions here.

The majority turns next to three opinions from two out-of-state courts in purported support of its holding. In the first, *Commonwealth v. Szerlong* (Mass. 2010) 933 N.E.2d 633 at page 641, the defendant (while a fugitive) *married* the witness to enable her to claim the spousal privilege. A marriage demonstrates a much more committed course of action than do the two telephone calls here. In the second case, also from Massachusetts, the court held that *colluding* with a witness to secure the witness's unavailability for trial

5

*could* qualify as wrongdoing, remanding for an evidentiary hearing. (*Commonwealth v. Edwards* (Mass. 2005) 830 N.E.2d 158.) "As its primary indication of collusion, the Commonwealth relied on its representation of the contents of several recorded telephone conversations, initiated by Edwards while he was incarcerated and made just prior to two scheduled trial dates . . . in which Edwards allegedly conspired with Crockett and others to procure Crockett's unavailability for trial." (*Id*. at p. 164.) Because this information came by proffer only, we do not know the extent of the collusion between the defendant and witness and whether it is factually similar to the case at hand; hence the remand.

In the third case, a pre-*Crawford* case from Iowa, the court held the defendant had encouraged and influenced the witness--his brother, who was a minor and 15 years younger than the defendant--not to testify after he encouraged the witness, *already incarcerated for refusing to testify*, to remain firm in his refusal by making a variety of written statements to that effect in multiple letters. (*State v. Hallum* (Iowa 2000) 606 N.W.2d 351, 353, 356-357.) Although closer to comparable than any of the others, the case is factually distinguishable.

The majority posits that these three out-of-state cases "flesh out the broad" substantial evidence standard that our Supreme Court has set forth for us to use when evaluating the trial court's factual findings (see *People v. Johnson* (1980) 26 Cal.3d 557, 576-578). (Maj. opn., p. 22.) But even if these out-of-state cases were not distinguishable on their facts, they should not be relied upon to define the law here in California.

In *Jones, supra,* 207 Cal.App.4th 1392, the Second Appellate District, Division Five noted that " 'wrongdoing' has not been limited to the killing of a victim or even of a nonvictim witness." (*Id.* at p. 1399.) The reported facts of the case are sparse, but the opinion references 12 phone calls consisting of *10 hours* of conversation between the defendant and the dissuaded witness (*id*. at p. 1396) and cites the trial court's finding that "the implication from the discussion that they had is that he has friends on the outside

6

who can assist him in doing whatever is necessary" (*id.* at p. 1398.) Beyond the vast disparity in the degree of contact between *Jones* and the witness as compared to our case, *Jones* is a threats case. Our case is indisputably not.

In *People v. Merchant* (2019) 40 Cal.App.5th 1179, the Fourth Appellate District, Division One cited *Jones* to affirm the trial court's finding of forfeiture by wrongdoing. Merchant asked his friends to " 'keep [the witness] away for six months' " (*id.* at p. 1187), and called the witness himself, many times, reminding her that his friends were watching her to make sure she did not testify (*ibid.*). He made what the appellate court characterized as "obsessive, repeated calls," including telling the witness that she had "better" stick by him. (*Id.* at p. 1188.) There was a criminal protective (no-contact) order in place, meaning Merchant's conduct was lawless from the outset. "Merchant made 167 calls over a five-month period soon after his arrest, locking in Lisa's nonappearance before he decided to reject the plea offer." (*Ibid.*) The trial court had noted the case for forfeiture was "a lot weaker" than the usual forfeiture case due to defendant's "passive coercion." (*Ibid.*) Even assuming the forfeiture findings in *Jones* and *Merchant* were correct, such a finding in *this* case--where defendant made two short phone calls over a four month period--extends far beyond the current state of California law.

If the doctrine applies to this case solely for the reasons explained by the majority, thus in every case where intent and causation are present, it could apply to strip defendants of their right to confront their accusers in a wide variety of benign situations. Consider an "eggshell" witness, to whom a defendant suggests on an isolated occasion that the witness's testimony may have adverse (but relatively minor) consequences of some sort. If the witness is so influenced by the one mention of adversity that the witness is dissuaded from testifying, intent and causation are properly found. But has the defendant also acted "wrongfully" such that he forfeited his bedrock constitutional right to confront his accuser?

7

Next consider an accused brother, where the only witness to his crime is his sister. Imagine the brother tells his sister over the telephone that the pair's grandmother will stop loving the sister if she testifies against the brother, and, based on that one mention of the prospect of her grandmother's lost love, the sister recants or fails to appear. If a trial court finds that those facts show both intent to dissuade and causation, does the brother forfeit the right to confront the only eyewitness against him, merely for mentioning the grandmother's distress to his sensitive sibling? Will we be reviewing for substantial evidence the trial court's determination that the defendant intended to dissuade her through his stray remark about their grandmother's love and that the stray remark in fact dissuaded her? And if we find the determination supported, does that conclusion lead to forfeiture as a matter of law, without regard to the severity or duration of the defendant's actions?

Under the majority opinion as I understand it, my hypothetical defendants' conduct would result in the doctrine's application, and they would be summarily stripped of their right to confront the only witness to their crimes. I am not willing to join the majority in so holding.

II

*The Error Was Not Harmless*

Violations of the right to confrontation are subject to federal harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 681.) "Since *Chapman*, we have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." (*Ibid.*)

This court has described the test for the *Chapman* standard as follows: "To find the error harmless we must find beyond a reasonable doubt that it did not contribute to the verdict, that it was unimportant in relation to everything else the jury considered on

8

the issue in question." (*People v. Song* (2004) 124 Cal.App.4th 973, 984; see *Yates v. Evatt* (1991) 500 U.S. 391, 403-404.)

The evidence of Lupe's statements to the responding police officers was by far the strongest evidence against defendant. Her statements detailed her claims of violence, fear, or, for that matter, any of the conduct needed to support the false imprisonment and corporal injury convictions. Without Lupe's statements, the evidence against defendant only consisted of the landlord's observations of disturbances at the apartment and a bruise on Lupe's arm, Officer Hatcher's observation of bruising and Lupe's apparently discomfited demeanor, Officer Gonzalez's observation of Lupe's emotional distress when he responded to a vandalism call (and the jury hung on the charges resulting from that incident), and Sergeant Ramos's report from Lupe that she and defendant argued when he tried to make peace with her. Even the recorded call that formed the basis for the dissuading charge made no sense and proved nothing if not considered within the context of Lupe's previous statements to the officers.

Further, even if I were to consider the People's case as fairly strong, "there is no way to ever define just what quantum of evidence is necessary to convince a jury beyond a reasonable doubt of a defendant's guilt." (*People v. Accardy* (1960) 184 Cal.App.2d 1, 4.) After all, defendant had a low burden to satisfy, namely, raising a reasonable doubt in the mind of even one juror, to obtain at least a mistrial. (See *People v. Soojian* (2010) 190 Cal.App.4th 491, 518-521 [new trial motion case, concluding a hung jury is a more favorable result, and therefore a defendant need not show an *acquittal* was reasonably probable].) Here, the jury hung on the August 13 counts despite hearing the evidence of Lupe's statements to Gonzalez. Further, the harm caused by denial of defendant's right to confront Lupe about the unwitnessed crimes was exacerbated by her potential credibility issues (prior convictions and drug use), as defense counsel pointed out at the hearing.

9

For all of these reasons, I cannot say with any confidence that the error in admitting Lupe's hearsay statements was harmless beyond a reasonable doubt. It is not at all clear that the statements "did not contribute to the verdict" and were "unimportant in relation to everything else the jury considered on the issue." (*People v. Song*, *supra*, 124 Cal.App.4th at p. 984.) To the contrary, the statements provided the only solid bases for conviction for the three counts on which the jury managed to reach verdicts as well as the two counts on which it deadlocked.

I recognize that "this particular type of crime is notoriously susceptible to intimidation or coercion of the victim to ensure that she does not testify at trial. When this occurs, the Confrontation Clause gives the criminal a windfall. We may not, however, vitiate constitutional guarantees when they have the effect of allowing the guilty to go free." (*Davis v. Washington*, *supra*, 547 U.S. at pp. 832-833.)

The majority proceeds down a slippery slope that could easily result in the doctrine's application to minimal and fairly benign conduct if consistently applied, a path that is not supported, much less compelled, by the authority on which the majority relies. I cannot follow my colleagues down this path absent guidance from our high court.

The statements' admission was prejudicial error. Accordingly, I would reverse the judgment.


DUARTE, J.


10